PER CURIAM.
|)We granted the state’s application to consider the First Circuit’s split-panel decision reversing defendant’s conviction and habitual offender sentence for the creation or operation of a clandestine methamphetamine laboratory in violation of La.R.S. 40:983. State v. Duke, 12-0172 (La.App. 1 Cir. 11/8/12), 2012 WL 5462757 (McClen-don, J., dissenting without written reasons) (unpub’d). For the reasons that follow, the court of appeal’s decision is reversed and defendant’s conviction and sentence are reinstated.
In the single assignment of error asserted below, defendant challenged the recovery of 40 tablets of pseudoephedrine from a vehicle parked on the lot of a Wal-Mart Supercenter on Natchez Drive in Slidell, Louisiana, on the afternoon of January 26, 2011, by Detectives Comeaux and Boynton of the St. Tammany Parish Sheriffs Office. Defendant moved before trial to suppress the pseudoephedrine tablets on grounds that they were the products of an illegal seizure. The trial court heard the motion on the day of trial after jury selection and before opening statements, and denied it. Thereafter, the jury found defendant guilty as charged. 1¡¡The court sentenced him as a habitual offender to 13 years imprisonment at hard labor.
On appeal, the First Circuit addressed his single assignment of error premised on the argument that the officers lacked reasonable suspicion to conduct an investigatory stop in the Wal-Mart parking lot. The court of appeal properly considered the testimony presented at the mid-trial hearing on the motion to suppress as well as in the immediately ensuing evidentiary portions of the trial. State v. Burkhalter, 428 So.2d 449, 455 (La.1983) (review of the correctness of a ruling on a pretrial motion to suppress takes into account “the totality of the evidence presented at the motion to suppress hearing and the trial.”). That testimony gave the following account of the circumstances leading to defendant’s arrest and prosecution. Assigned to the narcotics task force in the St. Tammany Sheriffs Office, Detective Comeaux primarily investigated methamphetamine production and trafficking. In that capacity, he arrived at the Wal-Mart on Natchez Drive, located just off the interstate, on January 26, 2011, because it was the source of frequent complaints about the *883 sale of pseudoephedrine, the precursor drug for methamphetamine, and other components used in the manufacture of the drug. The detective described the location as “pretty much a hot bed for that type of activity.” The detective headed first for the pharmacy and observed Jimmy Catchings purchase a box of cold and allergy medicine from behind the counter. Co-meaux immediately suspected that the cold medication contained pseudoephedrine which “is only obtainable from the clerk behind the pharmacy. You can’t just buy it off the shelf.” The officer explained that in the effort to combat the manufacture of methamphetamine, the purchase of over the counter cold and allergy medications containing the precursor drug pseu-doephedrine are closely monitored (in part by placing them behind the counter) and logged through the | ¡National Precursor Log Exchange [NPLEx], an electronic service used by various pharmacies (such as Walgreens, Rite Aid, and Wal-Mart) and law enforcement officials. The detective also noticed that defendant, who had been standing in the same line a few customers behind Catchings, made a purchase from the pharmacy moments later, although he did not see what defendant bought.
Detective Comeaux continued on his surveillance patrol through the store, passing through the sporting goods and electronics sections where other components used in the manufacture of methamphetamine, such as Coleman fuel and lithium batteries are sold. He observed no suspicious activity and headed for the front door. Fortuitously, the detective found himself behind defendant who was also walking out of the front door and heading for a vehicle parked on the lot. Defendant climbed into the backseat of the vehicle on the driver’s side and Comeaux observed that Catchings was also sitting in the backseat of the car directly behind the front passenger seat and across from defendant. Both men were looking down, “concentrated towards the lap,” and Comeaux suspected that given the association of the two men, what defendant had purchased from the Wal-Mart pharmacy immediately after Catchings also contained pseudoephedrine. Comeaux’s training and experience had made him familiar with a tactic used by methamphetamine producers, and known to law enforcement officials as “smurfing,” by which several people purchase pseu-doephedrine at staggered intervals in the same pharmacy to avoid alerting authorities. This pattern represented a change in tactics brought about by NPLEx, which linked various pharmacies together in 2010 and prevented “smurfs” from “go[ing] from Wal-Mart to Rite Aide, and to every other pharmacy, and each buy a box of Sudafed.”
The detective immediately relocated his patrol unit and parked directly behind the target vehicle to continue his surveillance. He watched as another |4passenger, Deanne Wetzler, got out and walked into the Wal-Mart while a fourth individual approached the vehicle and sat in the driver’s seat after looking around and engaging in what Comeaux described as “counter surveillance” behavior. The officer then observed defendant conduct a hand-to-hand exchange of money with the apparent driver, later identified as Sky Hatcher, in the car. Suspecting that he had just observed a drug transaction, although he did not see anything exchanged for the currency, Comeaux and his partner approached the car and told Hatcher to step from the vehicle. As Comeaux began conversing with Hatcher, Wetzler walked out of Wal-Mart holding a bag in her hand. Detective Boyton stopped Wetzler, directed her to the police unit, and took the Wal-Mart bag from her hand. Boyn-ton gave the bag to Detective Comeaux, who opened it and found a box of Sudafed, *884 the active ingredient of which is pseu-doephedrine. At that point, Comeaux removed defendant and Catchings from the vehicle. The officer patted down both men and placed defendant in handcuffs. Because the car doors were “open and unlocked,” Detective Comeaux then conducted a “wing span” search of the car “to identify any weapons that may be involved in any kind of [il]lieit drug transaction,” as well as “any contraband that may have been used during that time.” The detective observed lying on the top of the rear seat and in the middle of the seat two empty boxes of 20-count Sudafed and four empty plastic blister packs. The detective also found on the rear seat a tied off plastic Wal-Mart bag. Comeaux opened the bag and observed 40 loose tablets of Sudafed, although the tablets are ordinarily packaged individually in the blister packs now “because of regulations, made primarily because of methamphetamine.”
Comeaux immediately gave all four occupants of the vehicle them Miranda rights and began individual interviews with them. Defendant first stated that he had purchased a box of Sudafed for his sinuses. When asked by Comeaux why all [ Bof the pills had been had been removed from their box, squeezed out of them blister packs, and placed in a shopping bag with the pills evidently purchased by Catchings and given similar treatment, defendant offered no explanation but simply replied that Catchings had asked him to travel from Bogalusa, where they were from, to Slidell to purchase Sudafed. At that point, Detective Comeaux arrested everyone on the scene for the creation or operation of a clandestine methamphetamine laboratory in violation of La.R.S. 40:98s.[1]
Comeaux readily acknowledged at trial that the total amount of pseudoephedrine purchased at Wal-Mart, estimated at 7.2 grams if the tablets bought by Ms. Wetzler were also included, did not exceed the 12-gram limit imposed by La.R.S. 40:962.1.1, and that it was not illegal to purchase Sudafed for someone else. The detective emphasized, however, that the totality of the circumstances known to him indicated that otherwise lawful purchases were intended for unlawful purposes. The officer explained that in the methamphetamine trade, producers ordinarily do not want “five or six boxes of empty Sudafed blister packs laying around” for the police to find, and “if you were going to meet with somebody and trade those boxes, it’s easier to conceal and hide during a transaction a small bag of tablets versus three actual full size boxes of pseudoephedrine.”
On the basis of this testimony, the court of appeal found that while Detective Co-meaux had unquestionably seized defendant when he ordered him from the car, frisked him, and placed him in handcuffs, the court did not have to resolve whether |fithe officer’s conduct was justified by a reasonable suspicion defendant had been engaged in “smurfing” as part of a plan to produce methamphetamine. The court of appeal determined that, in any event, the detectives lacked probable cause to arrest defendant for possession of what amounted to lawful amounts of pseudoephedrine available for purchase over the counter. Duke, 12-0172 at 11 (“We find that the information available to Detective Co- *885 meaux before he searched the vehicle was not sufficient to justify a belief that the defendant had committed or was in the process of committing a crime....”). Thus, the search of the vehicle could not be rationalized as incident to a lawful arrest, whether the search occurred immediately before or after the formal arrest. Id., 12-0172 at 12; see Arizona v. Gant, 556 U.S. 332, 352, 129 S.Ct. 1710, 1723-24, 173 L.Ed.2d 485 (2009) (“Police may search a vehicle incident to a recent occupant’s arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee’s vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.”). The court of appeal further determined that because the officers lacked probable cause, Comeaux’s search of the vehicle’s interior could not be rationalized under the automobile exception to the warrant requirement. See Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996) (“If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.”). The majority on the panel thus concluded that the seizure of the Sudafed tables was illegal because “[t]he facts, known to Detective Comeaux prior to his search of the vehicle were [merely] that, of the four vehicle occupants, one (Catchings) had bought cold and allergy medicine that may 17have contained pseudoephedrine; one (the defendant) had stood in the same pharmacy line as Catchings; one (Wetzler) had purchased Sudafed (a fact known only after Hatcher had been removed from the vehicle and Wetzler’s Wal-Mart bag was taken away from her by the detectives) and one (Hatcher) exchanged money with the defendant.” Duhe, 12-0172 at 15.
We agree with the court of appeal that Detective Comeaux lacked probable cause to arrest defendant before he conducted his “wing span” search and went into the vehicle. But we also agree with the state that the officer had reasonable suspicion to detain all of the occupants of the vehicle and that he acted reasonably in entering the vehicle in a search for weapons to protect himself and his partner. We further find that the automobile exception to the warrant requirement does apply the officer’s recovery of the 40 tablets from the Wal-Mart shopping bag, a closed container sitting on the back seat next to the empty Sudafed boxes and extruded blister packs, a circumstance omitted from the court of appeal’s assessment of probable cause.
It is settled that while an arrest requires probable cause, an investigatory stop requires only the lesser standard of reasonable suspicion enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and codified in Louisiana under La.C.Cr.P. art. 215.1. In making a brief investigatory stop the police still “must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.” State v. Kalie, 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). This level of suspicion, however, need not rise to the probable cause required for a lawful arrest. The police need have only “some minimal level of objective justification....” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting INS v. Delgado, 466 8U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)). A reviewing court must take into *886 account the “totality of the circumstances — the whole picture,” giving deference to the inferences and deductions of a trained police officer “that might well elude an untrained person.” Cortez, 449 U.S. at 417-18, 101 S.Ct. at 695; see also Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (high crime area and subjective expectations of police plus startled look and “unprovoked flight” supports a Terry stop); State v. Williams, 421 So.2d 874, 877 (La.1982) (“[Gjiven the sudden departure of the trio at the approach of the police, given the furtive gesture of one of them and the coincident attempt at departure by defendant in his vehicle, the officers’ hunch flowered into reasonable suspicion, based on articulable facts....”). The court must also weigh the circumstances known to the police “not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.” Id.
In the present case, and giving due deference to Detective Comeaux’s experience and expertise in the investigation of the illicit methamphetamine trade, the detective had the requisite minimal objective basis for detaining all four occupants of the vehicle who arrived together but took pains not to seem together as they engaged in “smurfing,” even discounting his opinion that the exchange of money between Hatcher and defendant constituted some sort of drug transaction (for which the officer could not articulate an objective basis because he did not observe the contemporaneous transfer of an object), and even further discounting the discovery of the box of Sudafed in the bag taken from Deanne Wetzler by his partner. Moreover, once Comeaux initiated the stop, he had the authority to order defendant and the other occupants out of the vehicle for officer safely. See State v. Landry, 588 So.2d 345, 347 (La.1991) (police may order passengers to exit a car in a routine traffic stop for reasons of the officers’ safety); see also Maryland v. 9Wilson, 519 U.S. 408, 413, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997) (when a vehicle is stopped, even for a traffic violation, officers may lawfully order its passengers to exit the vehicle).
 During an investigatory stop, police officers may take the necessary precautions to protect themselves. United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir.1993) (“Since police officers should not be required to take unnecessary risks in performing their duties, they are ‘authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry ] stop.’ ”) (quoting United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 683-84, 83 L.Ed.2d 604 (1985)). In the present case, Detective Comeaux testified that he observed defendant engage in what he believed to be the procurement of ingredients for the production of methamphetamine. Comeaux and his partner were also outnumbered by the vehicle’s occupants two to one. Given the number of suspects and the well-known association of guns and narcotics trafficking generally, United States v. McGehee, 672 F.3d 860, 870 (10th Cir.2012) (“[W]e have long recognized the close association between firearms and drug-trafficking.”) (citations omitted); State v. James, 99-3304, p. 7 (La.12/8/00), 795 So.2d 1146, 1150 (citing United States v. Trullo, 809 F.2d 108, 113-14 (1st Cir.1987)), and further, given the particular association of methamphetamine production and guns, United States v. Ortega, 2010 U.S. Dist. LEXIS 48346, at *18 (D.Neb.2010) (“Methamphetamine is highly addictive, is associated with gangs, violence and guns, and is cheap and easy to make.”); United States v. McFall, 2007 U.S. Dist. LEXIS 95034 85, at *5 (S.D.Iowa 2007) (noting the asso *887 ciation of paranoia with making and keeping methamphetamine and thus with guns); State v. Kalathakis, 563 So.2d 228 (La.1990) (addressing fatal consequences of a police raid on a methamphetamine lab | pleading to the death of the co-perpetrator after he engaged the officers in gun battle), Comeaux’s decision to handcuff defendant for the duration of the stop was justified for officer safety and did not convert the encounter from a Terry stop to an arrest. State v. Porche, 06-0312, pp. 8-9 (La.11/29/06), 943 So.2d 335, 340 (arrest-like features such as the use of drawn weapons and handcuffs may, but do not invariably, render a seizure a de facto arrest).
The same concerns for officer safety prompted by the association of guns with drugs generally, and methamphetamine in particular, also justified Comeaux’s initial entry into the vehicle, given that the doors were wide open and the occupants were standing nearby. In Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court recognized a limited protective warrantless search of the passenger compartment of a vehicle during a Terry stop may be justified if the officer has “specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant [his belief] that the suspect is dangerous and the suspect may gain immediate control of weapons.” Long, 463 U.S. at 1049-50, 103 S.Ct. at 3481. Under these circumstances, the officer may conduct a search of the passenger compartment of the automobile, limited to those areas in which a weapon may be placed or hidden. Id., 463 U.S. at 1049-50, 103 S.Ct. at 3481.
In the present case, Detective Comeaux and his partner were dealing with four suspects, with apparently only defendant handcuffed, during an investigation of possible trafficking or production of methamphetamine. Moreover, during his testimony at the motion hearing, Comeaux indicated that he understood the link between drugs and firearms and chose to search the car for that reason. Under the circumstances, in which it appears three suspects were unrestrained and free to [n reach into the car, Comeaux had a particularized concern for his safety sufficient to justify a protective search of the vehicle.
The decision in Long did not give the detective free rein to rummage through any and all closed containers in the search not only for weapons but also for any contraband drugs. The container observed in Long, a pouch tucked under the armrest on the front seat of the car, was not closed but partially open to the officer’s view when the officer first shined his flashlight into the car in a search for other weapons after observing a large hunting knife on the floorboard and then entered the vehicle and lifted the armrest to expose the pouch and the marijuana sticking out of it. Long, 463 U.S. at 1036, 103 S.Ct. at 3474. In the present case, even assuming that Detective Comeaux could retrieve the Wal-Mart bag without any additional information, a closed plastic bag containing only 40 tablets of Sudafed weighing less than seven grams, or approximately a quarter of an ounce, is presumably too light to signal that it may contain a firearm or knife of any appreciable size and thus justify opening the bag by the officer in a self-protective search for weapons. See 4 Waren R. LaFave, Search and Seizure, § 9.6(2), pp. 934-35 and n. 370 (5th ed.2013) (discussing Long as applied to closed container searches).
Before he retrieved the bag, however, Detective Comeaux had observed the two empty Sudafed boxes and four empty blister packs sitting in plain view in the mid- *888 die and on top of the back seat next to the Wal-Mart shopping bag in the space that separated defendant and Catchings when they were seated in the car. At that point, and before he opened the bag, Detective Comeaux had an objective basis for concluding, in the context of the other circumstances known to him, that defendant and Catchings had been sitting in the backseat of the vehicle looking down at their laps because they were busy popping the Su-dafed pills out of their blister packs, 11gand that the shopping bag on the seat in between them offered the likely repository for the pills. Given his training and experience in the field, the detective had probable cause to believe the vehicle’s occupants were, in fact, “smurfing,” acquiring otherwise legal amounts of over-the-counter drugs containing pseudoephedrine for an illegal purpose. Probable cause and exigent circumstances arising from the inherent mobility of automobiles, the underpinning rationale of the automobile exception to the warrant requirement, thus validated the officer’s seizure of the bag and opening it to find the 40 tablets of Sudafed.
The trial court therefore properly denied defendant’s motion to suppress. The decision of the court of appeal is therefore reversed and defendant’s conviction and sentence are reinstated.
DECISION OF COURT OF APPEAL REVERSED; DEFENDANT’S CONVICTION AND SENTENCE RENSTAT-ED.

. R.S. 40:983 states in pertinent part:
A. Creation or operation of a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance is any of the following:
il) The purchase, sale, distribution, or possession of any material, compound, mixture, preparation, supplies, equipment, or structure with the intent that it be used for the unlawful manufacture of a controlled dangerous substance.