ROBERT M. MURPHY, Judge.
|2Defendant, Justin Butler, appeals his conviction and sentence for illegal possession of stolen firearms, a violation of La. R.S. 14:69.1, contending the trial court erred in denying his motion to suppress the evidence and statement. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On September 25, 2012, the St. Charles Parish District Attorney filed a bill of information charging defendant, Justin Butler, with illegal possession of stolen firearms in violation of La. R.S. 14:69.1 (count one); convicted felon possessing a firearm or carrying a concealed weapon in violation of La. R.S. 14:95.1 (count two); and possession of a firearm while in possession of a controlled dangerous substance in violation of La. R.S. 14:95(E) (count three). On that same date, defendant was arraigned and pled not guilty. Defendant’s motion to suppress was denied on February 5, 2013.[1]
|sOn March 4, 2013, the prosecutor advised the trial judge that the State would proceed to trial on count one only. The next day, the case was tried before a six-person jury that found defendant guilty as charged on count one. Defendant subsequently filed a Motion for Post-Verdict Judgment of Acquittal and/or Motion for New Trial on March 11, 2013, that was denied. On July 9, 2013, the trial judge sentenced defendant to five years in the Department of Corrections, and the State nolle prossed counts two and three. On that same date, defendant filed a timely motion for appeal that was granted.

FACTS

At trial, Trooper Gustave Bethea, of the Louisiana State Police, testified that on July 29, 2012 at around 7:30 a.m., he was monitoring traffic on Interstate 310 when he observed a speeding vehicle, a two-door Ford Mustang, traveling southbound from behind him. Using radar, Trooper Bethea determined that the vehicle was going 82 miles per hour. The trooper got behind the vehicle and activated his emergency lights in order to make a traffic stop. In response, the driver of the vehicle pulled over to the right shoulder on the elevated portion of the roadway. Trooper Bethea signaled and ordered the driver to exit his vehicle, but the driver did not comply immediately. As such, the trooper approached the vehicle and again asked the driver to exit his vehicle. The driver now complied with the trooper’s command and exited the vehicle.
Afterward, Trooper Bethea asked to see his driver’s license. The driver reached into his pocket, pulled out his driver’s license, and handed it to the trooper. When he did so, Trooper Bethea saw that the driver’s hand was trembling more excessively than what he normally sees as a result of a traffic stop. In response to the trooper’s generic questions, the driver initially maintained eye contact with him and answered the questions calmly and confidently. Trooper Bethea then asked the 14driver if there were any weapons in the vehicle, and the driver broke eye contact and said “no” in a less audible voice.
Trooper Bethea testified that those observations of the driver raised “red flags” for him and had him concerned about officer safety. Since the trooper was by himself and he could see there were three *309 passengers in the vehicle, he conducted a pat down of the driver for officer safety but did not feel anything. Afterward, he had the driver sit down by the front of the police vehicle on the shoulder and lean his back against the bridge rail. Next, Trooper Bethea approached the vehicle and asked the front-seat passenger to exit the vehicle, and he complied. He then asked the front-seat passenger if he had any weapons in the vehicle, and the front-seat passenger said, “No.” Trooper Bethea conducted a pat down of the front-seat passenger for weapons but did not find any. Afterward, the trooper had the front-seat passenger walk to the front bumper of the vehicle.
Next, Trooper Bethea made contact with the “right” rear-seat passenger, who was later identified as defendant, Justin Butler. The trooper observed that defendant was not wearing a seat belt and that his hands were in between his legs below the seat line. The vehicle was dark inside and the trooper could not clearly see defendant’s hands. Therefore, Trooper Bethea asked defendant to place his hands on top of the front-passenger head rest, and defendant complied with that request. Afterward, the trooper asked defendant to step out of the vehicle, and defendant complied with that request as well. Trooper Bethea then asked defendant if he had any weapons, and defendant said, “Who me?” The trooper repeated the question, and defendant then responded, “Not that I know of.”
Trooper Bethea thought defendant’s responses were odd, especially in conjunction with the driver’s response. Therefore, the trooper conducted a pat-down of defendant but did not find anything. Trooper Bethea testified that while |fistanding next to defendant, he could smell the odor of marijuana coming off of defendant’s clothing. He also noted that defendant was very nervous, and he could feel defendant’s heart pounding, much more so than the other passengers he had conducted pat-downs on. Trooper Bethea then asked defendant to step to the front bumper near the right front-seat passenger, and defendant complied. Afterward, the trooper asked the “left” rear-seat passenger to step out of the vehicle, and he complied. Trooper Bethea then asked the “left” rear-seat passenger if he had weapons on him, and he said, “No.” The trooper patted down that passenger but did not find anything. The trooper got no overt indications of nervousness from him. He had that passenger step out of the vehicle and sit next to the driver.
Trooper Bethea testified that he still felt uncomfortable, since there were four individuals outside the vehicle, and he was by himself. Therefore, he felt it necessary to conduct a protective sweep of the vehicle to make sure there were no weapons inside, in the event one of the passengers went back to the vehicle. Trooper Bethea went to the front driver’s side of the vehicle. As soon as he stuck his head inside he could smell unburned, fresh marijuana. The trooper looked under the driver’s seat but saw no weapons. He looked in the “left” rear side and did not see any weapons. Trooper Bethea moved to the right front passenger-side and looked under the seat but did not see any weapons. He opened the center console, smelled an “overwhelming” odor of marijuana, and saw a clear baggy with green vegetable matter sitting on top of the interior of the console.
The trooper then looked in the “right” rear side. He noticed that the seat was pulled up a little bit creating a small void. Trooper Bethea subsequently looked under the seat and could see the butt of a pistol facing right and ready for a “right handed draw.” He removed the pistol, a 9 mm semiautomatic Glock, called the dis *310 patcher, and asked him to check the serial number — PFG 197. The dispatcher |fidid so and advised that the weapon was listed as stolen. Trooper Bethea testified that there were ten rounds in the magazine and one round in the chamber. At that point, the trooper called for assistance. The trooper then handcuffed all the occupants and was assisted in handcuffing the last one or two by another trooper. Trooper Bethea advised the driver and three passengers of their rights while they were all seated outside the vehicle.
Afterward, defendant told Trooper Be-thea that the weapon was his and that he acquired it for protection because he feared for his life. The driver subsequently admitted that the marijuana was his. The other two passengers said they did not know about the weapon or the marijuana, which Trooper Bethea believed after more questioning. Trooper Bethea then arrested defendant and the driver and transported them to the St. Charles Parish lockup. While at lockup, Trooper Bethea presented a rights form to defendant who signed the form and indicated that he understood his rights, was willing to answer questions at that time, and that no pressure or promises had been made for him to give a statement.
Defendant told him that his life had been threatened, that he had not called the police, and that his mother was supposed to call them but.did not. Trooper Bethea told defendant he could have a deputy take a report for him but defendant declined. He asked defendant if he could provide the name of the person who gave him the weapon; however, defendant stated he did not feel comfortable giving him that name. Trooper Bethea asked defendant if he would give a written statement, and his reply was, “Yes, but not now.” The trooper also presented a property receipt form to defendant which indicated that the weapon was being seized from him and the trooper was taking it as evidence. Defendant signed that form. Afterward, he turned defendant over to the sheriffs office and did not see or talk to him again or obtain a written statement from him. Trooper Bethea subsequently 17located the owner of the stolen weapon and returned it. He also testified that part of the stop was captured on videotape, which was shown to the jury.
Jeremy Blouin testified that he owned a Glock 19, 9 mm semiautomatic pistol with serial number PFG 197. He further testified that on June 10, 2012, his pistol was stolen from his vehicle while he and his father attended an LSU baseball game. The weapon was inside his vehicle, when the vehicle was stolen. Mr. Blouin explained that he reported the theft to the LSU police and that they made a report. He asserted that on July 29, 2012, he received a call from the State Police telling him that they had recovered his gun and that he could come and retrieve it, which he subsequently did. Mr. Blouin testified that he had never seen defendant before and that defendant did not have his permission to be in possession of his gun. It was never determined who stole his vehicle.
Defendant disputed Trooper Bethea’s version of events. He testified that on July 29, 2012, he got into the back seat of the vehicle in question with the driver and two other passengers. The vehicle was traveling down Interstate 310, and he fell asleep. He recalled that when he woke up, the driver was speeding. Defendant heard sirens, and a state trooper pulled them over. The trooper approached them and told the driver to exit the vehicle. Defendant claimed that the trooper was aggressive in his questioning and accused them of having a gun in the vehicle. The trooper subsequently positioned the driver *311 in front of the bumper of the trooper’s vehicle and sat him down with his back “against the barrier wall.”
Afterward, the trooper returned to the vehicle and asked the front-seat passenger to exit the vehicle, which he did. The trooper questioned that passenger and then had him step to the back bumper along the right-side rear tire. Defendant contended the trooper put handcuffs on that passenger and had him sit against the bridge. He admitted that he could not hear what the trooper was saying to the other | ¡^individuals. Next, the trooper came to the vehicle and told him to exit the vehicle, and he did. Defendant asserted that when the trooper approached the vehicle, his (defendant’s) hands were on top of his lap and not near the floorboard of the vehicle.
The trooper then told defendant to put his hands on top of the ear, after which the trooper patted him down. The trooper asked him if he had anything on his person, and he said, “No.” The trooper also asked defendant if he had knowledge of any drugs or weapons in the vehicle, and he said, “No.” Defendant also remembered that the trooper asked if there were weapons in the vehicle and that he answered, “Not to my knowledge.” Defendant denied responding to the trooper “Who me?” when the trooper asked him about the gun. The trooper subsequently told defendant to step in front of the vehicle away from the front passenger and the driver.
Defendant testified that eventually, the driver and the three passengers were in locations outside and away from the vehicle. Afterward, the trooper searched the vehicle but defendant could not see exactly what he was doing. He did not see what the trooper found or where he found it. When the trooper exited the vehicle, he told them that they had lied to him. Defendant testified that the trooper did not come to him and ask him about the weapon he found. He claimed that the trooper loudly asked all of them who it belonged to and that if nobody told him he would take all of them to jail. Defendant testified that the trooper asked him where he had been seated and that he told the trooper he was sitting in the rear-passenger seat. The trooper then put handcuffs on defendant and brought him back to the police vehicle.
Defendant claimed that the trooper did not read him his rights before handcuffing him. He also claimed that he did not make a statement to the trooper 1^acknowledging possession of the weapon. Defendant testified that he did not know who the gun belonged to and that he did not have any knowledge that there were drugs or weapons inside the vehicle. He explained that he was getting a ride home with the driver and that he had not been in the vehicle with the driver the day before or the evening prior to the incident. Defendant denied telling the trooper that he had the gun for protection because someone had threatened his life. He claimed that the trooper suggested that answer to him. Defendant also denied telling the trooper that he would make a written statement that the gun belonged to him.
Defendant further testified that the trooper never collectively read them their rights before any questioning, nor did the trooper read defendant his rights prior to his reaching the jail. He asserted that he was left-handed and that the trooper never asked him if he was right or left-handed. Defendant claimed that he did not understand the rights form that was presented to him and that he only signed it because the trooper confused him. He stated that he did not read the rights form and that the trooper did not go over the rights form with him. Defendant also claimed that he did not read the property receipt he signed *312 and that it was not his understanding that he was acknowledging ownership or possession of the weapon when he signed it. He further testified that although he was seated right on top of the weapon, the ride in the vehicle was “regular and comfortable.”

DISCUSSION

Defendant argues in his single assignment of error that the trial judge erred in denying the motion to suppress evidence. He contends that the officer conducted a full and unwarranted search of the vehicle for evidence unrelated to speeding, and that it was not just a protective sweep since all four occupants were removed from the car and away from the reach of anything inside the vehicle. The l1flState responds that the trial judge did not err in denying the motion. It argues that Trooper Bethea was reasonably concerned for his safety and justified in searching the vehicle for weapons since he observed the driver and defendant show signs of extreme anxiety and odd behavior, and he smelled the odor of marijuana emanating from defendant and the interior of the vehicle.
The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. If evidence is derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial. War-rantless searches and seizures are per se unreasonable unless justified by one of the exceptions to the warrant requirement. State v. Wolff, 09-508, pp. 4-5 (La.App. 5 Cir. 12/29/09), 30 So.3d 897, 901.
In a hearing on a motion to suppress, the State bears the burden of proof in establishing the admissibility of evidence seized without a warrant. La. C.Cr.P. art. 703(D); State v. Lewis, 12-902, p. 6 (La.App. 5 Cir. 6/27/13), 121 So.3d 128, writ denied, 13-1921 (La.4/17/14), 138 So.3d 618. The trial court’s decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. Lewis, supra. In determining whether the ruling on a motion to suppress was correct, the court is not limited to the evidence adduced at the hearing on the motion, but may consider all pertinent evidence given at trial. State v. Washington, 00-1542, p. 12 (La.App. 5 Cir. 2/14/01), 782 So.2d 639, 645, writ denied, 01-940 (La.2/8/02), 807 So.2d 859.
The right of law enforcement officers to stop and interrogate those reasonably suspected of engaging in criminal activity is recognized by La.C.Cr.P. art. 215.1, as well as by state and federal jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195, 1198 (La.1983),11 cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). Generally, the decision to stop a vehicle is reasonable when the police have probable cause to believe a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). The standard is purely objective and does not take into consideration the subjective beliefs or expectations of the detaining officer. State v. Waters, 00-356, p. 4 (La.3/12/01), 780 So.2d 1053, 1056 (per curiam).
Once an officer has lawfully stopped a vehicle for a routine traffic violation, he is authorized to order both the driver and passengers out of the vehicle pending completion of the stop. State v. Brown, 09-209, p. 5 (La.App. 5 Cir. 12/29/09), 30 So.3d 907, 911. Additionally, an officer conducting a traffic stop may perform a pat-down search of a driver and *313 passengers upon reasonable suspicion that they may be armed and dangerous. Id. The Louisiana Supreme Court has recognized there is potential danger for an officer even during a routine traffic stop:
A police officer’s stopping a vehicle for a routine traffic violation sets up the possibility of a significant confrontational situation. The motorist may be driving a stolen vehicle, may be transporting contraband, may be in possession of illegal weapons, or may be involved in other criminal activity. The likelihood of danger may also be greater during darkness and in early morning hours, or when there are a number of occupants. A police officer who stops a vehicle for a routine traffic offense may be exposed, according to the circumstances, to a significant risk of attack, and concern for the safety of the officer may be a legitimate and weighty justification for reasonable intrusions into the privacy interests of the occupants of the stopped vehicle.
State v. Landry, 588 So.2d 345, 347 (La.1991).
In Michigan v. Long, 463 U.S. 1032, 1049-50, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983), the Supreme Court recognized that a limited protective warrantless search of the passenger compartment of a vehicle during a Terry stop may be justified if the officer has “specific and articula-ble facts which, taken 112together with the rational inferences from those facts, reasonably warrant [his belief] that the suspect is dangerous and the suspect may gain immediate control of weapons.” Under these circumstances, the officer may conduct a search of the passenger compartment of the automobile, limited to those areas in which a weapon may be placed or hidden. State v. Duhe, 12-2677, p. 10 (La.12/10/13), 130 So.3d 880, 887.
This Court has recognized that since police officers should not be required to take unnecessary risks in the performance of their duties, they are authorized to take such steps as are reasonably necessary to protect their safety and to maintain the status quo during the course of a Terry stop. State v. Morton, 08-164, p. 8 (La.App. 5 Cir. 7/29/08), 993 So.2d 651, 657 (citing State v. Porche, 06-312 (La.11/29/06), 943 So.2d 335, 339).
In the instant case, we find that Trooper Bethea was justified in conducting a limited protective sweep of the vehicle to look for weapons. Trooper Bethea, who had twelve years of law enforcement experience, testified that when the driver handed him his driver’s license, the driver’s hand was trembling more excessively than what he normally sees in a traffic stop. He further testified that the driver made eye contact and answered generic questions calmly and confidently, but when he asked the driver if there were any weapons in the vehicle, the driver broke eye contact and answered “no” in a less audible voice.
Also, when Trooper Bethea approached the vehicle a third time, he observed that defendant’s hands were in between his legs below the seat line.[2] It was *314 dark inside the vehicle and the trooper could not see defendant’s hands clearly. Trooper |13Bethea testified that when he asked defendant if he had any weapons, defendant responded, “Who me?” and that when he repeated the question, defendant replied, “Not that I know of.” Trooper Bethea thought those responses were odd, especially in conjunction with the driver’s response. Further, the trooper noticed that defendant was very nervous, and he could feel defendant’s heart pounding, his entire body trembling, and his hands sweating. When defendant exited the vehicle, Trooper Bethea could smell marijuana coming from defendant’s clothing.[3]
Trooper Bethea testified that after all four occupants had been removed from the vehicle, he still felt uncomfortable because he was by himself and outnumbered. He explained that although all four occupants were outside the vehicle, the area where they all were located was small. He felt that it was necessary to conduct a protective sweep of the vehicle to ensure that no weapons were inside of it in the event one of the occupants went back to the vehicle. Also, the occupants were not handcuffed at that time.[4]
For these reasons, we find that Trooper Bethea had a particularized concern for his safety sufficient to justify a protective sweep of the vehicle for weapons. As such, we further find that the trial judge did not err in denying the motion to suppress. This assignment of error lacks merit.

ERRORS PATENT DISCUSSION

Defendant requests an errors patent review. However, this Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App 5 Cir.1990), regardless of whether defendant makes such a request. The review reveals no errors patent in this case.

DECREE

For the reasons stated above, we affirm defendant’s conviction and sentence.

AFFIRMED.

. It is noted that the motion is not contained in the record; however, a suppression hearing was held.

. The jurisprudence indicates that if an officer has reasonable suspicion to stop a vehicle, and an occupant of the vehicle makes a movement during the stop as if attempting to hide an object, the officer has the right to conduct a limited protective sweep of the vehicle. See State v. Wilder, 07-960 (La.App. 5 Cir. 3/25/08), 983 So.2d 124, writ denied, 08-821 (La.10/31/08), 994 So.2d 532; State v. Carver, 531 So.2d 551 (La.App. 5 Cir.1988) (per curiam); State v. Davis, 612 So.2d 256 (La.App. 4 Cir.1992); State v. Archie, 477 So.2d 864 (La.App. 4 Cir.1985). In the instant case, although the trooper did not see defendant make any movement in the vehicle during the *314 stop, he did see defendant's hands below the seat line where the gun was ultimately found.

. This Court has recognized that because drugs, guns, and violence often go together, this may be a factor tending to support an officer's claim of reasonableness. State v. Thomas, 08-521, p. 9 (La.App. 5 Cir. 1/27/09), 8 So.3d 646, 653, writ denied, 09-391 (La.12/18/09), 23 So.3d 928.

. See State v. Duhe, 12-2677 (La.12/10/13), 130 So.3d 880. In that case, the Louisiana Supreme Court found that the officer had a particularized concern for his and his partner’s safety sufficient to justify a protective search of the vehicle, noting that it appeared that three of the four suspects were unrestrained and free to reach into the car. Moreover, the supreme court noted that the officer, who was conducting an investigation into drug trafficking, testified that he chose to search the car for weapons because he understood the link between drugs and firearms. Id., 12-2677 at 10-11, 130 So.3d at 887.