# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 14-268

DOMINIQUE FLOYD, ET AL.

VERSUS

CITY OF CARENCRO, ET AL.

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20122075
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and John E. Conery, Judges.

**AFFIRMED.**

**Harold Dewey Register, Jr.**
**A professional Law Corporation**
**Post Office Box 80214**
**Lafayette, Louisiana  70598-0214**
**(337) 981-6644**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
 **Dominique Floyd**
 **K.F.**
 **N.F.**

**John Fayne Wilkes, III**
**Joy C. Rabakaus**
**Tonya R. Smith**
**Ray R. Lucas**
**Kathy L. Smith**
**Brenda L. Mistrot**
**David C. Clarke**
**Borne & Wilkes, L.L.C.**
**Post Office Box 4305**
**Lafayette, Louisiana  70502-4305**
**(337) 232-1604**
**COUNSEL FOR DEFENDANT/APPELLEE:**
 **City of Carencro**
 **Chief Carlos Stout, in his Official Capacity as Chief of Police of the City**
 **of Carencro**

**CONERY, Judge.**

In this case, the plaintiff, Dominique Floyd (Mr. Floyd), seeks individual damages and damages on behalf of his minor children K.F. and N.F. resulting from an incident whereby Mr. Floyd was detained by officers from the Carencro Police Department who were responding to a "domestic in progress" call. After a trial on the merits, the trial court found in favor of the defendants, the City of Carencro and Chief Carlos Stout, in his Official Capacity as Chief of Police of the City of Carencro, and dismissed plaintiffs' case with prejudice. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On May 3, 2011, Corporal Gregory Domingue and Officer Kaylon Begnaud, officers employed by the City of Carencro Police Department, responded to a 911 call from Anastasia Zenon (Ms. Zenon) seeking assistance for a "domestic in progress."

Upon arrival at the Zenon home, the two officers questioned Ms. Zenon, who reported a dispute in which she was shoved by her ex-boyfriend, James Coleman. According to Ms. Zenon, Mr. Coleman was driving a green Tahoe with a paper license plate on his previous visit to her apartment, and Mr. Coleman's residence was right down the street in another part of the apartment complex. Both officers testified that upon reaching the scene of the alleged domestic incident, "Ms. Zenon pointed to a dark SUV passing on the street directly in front of them." Ms. Zenon indicated that the individual driving the vehicle was James Coleman, the alleged perpetrator.

Although Ms. Zenon initially testified at trial she did not identify the dark SUV to the officers as the vehicle of the alleged perpetrator, Ms. Zenon's

identification of the dark SUV to the officers is documented in her May 3, 2011 written statement. Ms. Zenon's identification of the dark SUV as the vehicle owned by Mr. Coleman is further supported by the trial testimony of Ms. Zenon's mother, Tabatha Zenon. Tabatha Zenon testified that she heard her daughter identify the dark SUV to the officers as the vehicle belonging to her ex-boyfriend, James Coleman.

Corporal Domingue immediately got into his police unit and followed the SUV to a parking space in the parking lot of an adjacent apartment building and parked his unit behind the SUV. Corporal Domingue approached the driver's side window and repeatedly asked the driver, Mr. Floyd, to hang up his cell phone, exit the vehicle, and provide identification. All of Corporal Domingue's requests were refused. At this point, Corporal Domingue radioed for back-up from Officer Begnaud and other officers in the vicinity.

At trial, Mr. Floyd testified that he had his four children in the vehicle, including his two-year old twins, R.F. and N.F., as well as two older minor children he supports financially. He was unaware of why he was stopped. He allegedly asked the officers to speak with his father on his cell phone. His father was an officer with the Lafayette Police Department.

When Mr. Floyd finally exited the vehicle, he was handcuffed. The witnesses at the scene, in particular Ms. Melissa Gotch and Ms. Brenda Bernard, testified they could hear Mr. Floyd shouting at the officers. A video of the incident confirms the officers' testimony that, while still handcuffed, Mr. Floyd attempted to walk away from the officers. In response, the officers immediately placed him in the police unit.

2

Mr. Floyd claimed that the officers slammed him against the hood of the police unit and kneed him in the back, injuring his back, shoulder, and wrist. None of the witnesses who testified at trial saw the officers knee Mr. Floyd in the back. There is nothing on the video to support such a claim.

Mr. Floyd also denied that he was trying to resist arrest or walk away from the officers while handcuffed. Yet, the video shows that he did try to walk away. Ms. Bernard, a resident of the apartment complex identified by Mr. Floyd as a witness to the incident, testified that she did not see the officers either kick or knee Mr. Floyd in the back. She only witnessed their attempts to detain him and then place him in the police unit.

Ms. Zenon was later summoned to the scene and informed officer Begnaud that Mr. Floyd was not Mr. Coleman, and therefore not the individual who was a part of the domestic dispute. Mr. Floyd was detained for only eleven minutes by the officers before he was released. No arrest was made and no charges were filed against Mr. Floyd for resisting the officers.

Subsequent to the incident, Mr. Floyd went to the Emergency Room of Lafayette General Medical Center ("LGMC"). The record reflects that Mr. Floyd told the personnel at LGMC the following:

> [Patient] states the police "mistaked" him for someone else and threw him on the ground and kicked him in the back and handcuffed him, then realized he was the wrong person and let him go. No marks seen to lower back. [Complains of] lower back pain and right wrist pain. Comment: Small amount of swelling and small abrasion noted to right wrist, [patient) is able to move right wrist but states that it hurts, [also] [complains of] pain with palpation.

All of the tests conducted on Mr. Floyd were normal. Based on his complaints of pain, he was prescribed Lortab and muscle relaxers. Mr. Floyd

3

subsequently treated with Dr. Maureen Brennan, a psychologist, and claimed the two younger children, K.F. and N.F., have suffered nightmares since the incident.

On April 11, 2012, Mr. Floyd filed suit individually and on behalf of the two minor children, K.F. and N.F., against the City of Carencro and Chief Carlos Stout, in his Official Capacity as Chief of Police of the City of Carencro, claiming that he "was the victim of police harassment and brutality and deliberate physical and mental abuse and humiliation caused by negligence."

A bench trial on the merits was held on November 18 and 19, 2013. On December 5, 2013, the trial court issued its "Reasons For Ruling" (Reasons) finding that "the officers did not use excessive or unreasonable force in restraining Floyd, considering the exigency of the situation in which they were placed." The trial court found that the officers acted in "good faith" pursuant to La.R.S. 46:2142 and, pursuant to the provisions of the statute, found "this statute provides immunity to these officers while responding to a domestic abuse situation." The trial court further stated, "There is no evidence that the officers failed to exercise good faith or due care in their handling of the situation or in their detention of Floyd."

The trial court also found that no evidence had been presented pursuant to the allegations in plaintiffs' petition for "negligent hiring, training and /or supervision of the officers," and thus those claims were dismissed. The trial court also dismissed Mr. Floyd's claims of violation of his Miranda rights based on the lack of evidence presented that "Floyd was ever interrogated or placed under arrest."[1]

---

[1] No appeal was lodged based on the dismissal of the claims of negligent hiring and a violation of Mr.Floyd's Miranda rights, and hence, we will not address those claims in this opinion.

On December 27, 2013, a judgment dismissing with prejudice all of plaintiffs' claims and taxing all costs to plaintiffs was signed by the trial court, from which the plaintiffs have lodged a timely appeal.

## ASSIGNMENTS OF ERROR

Plaintiffs assert the following assignments of error on appeal:

I.  The trial court erred in its determination that Officer Kalen Begnaud and Officer Greg Domingue provided credible testimony although there were several blaring internal contradictions and irreconcilable conflicts within their respective testimonies.

II.  The trial court erred in its determination that the initial stop of Dominique Floyd did not transform into a full blown arrest and that Dominique Floyd did not have the right to resist the unlawful arrest when he was apprehended and approached by officers when Floyd did not commit or was not about to commit a criminal offense.

III.  The trial court erred in its determination that officers of the Carencro Police Department utilized reasonable measures when performing an alleged Terry Stop because Officer Dominigue [sic] failed to ascertain any identifying information of Dominique Floyd.

IV.  The trial court erred in its determination that excessive force was not utilized by officers of the Carencro Police Department when performing an alleged Terry Stop of Dominique Floyd when Dominique Floyd was merely the victim of a false arrest and was simply inquiring into the validity of his arrest.

V.  The trial court erred in dismissing the physical and mental injuries incurred as a result of the Officers' negligent actions as to Dominique Floyd and his children.

## LAW AND ANALYSIS

### *Standard of Review*

"[A]ppellate jurisdiction of a court of appeal extends to law and facts." La.Const. art. 5, § 10(B). The appellate court must determine whether the trial court committed an error of law or made a factual finding that was manifestly

erroneous or clearly wrong. *Gibson v. State*, 99-1730 (La. 4/11/00), 758 So.2d 782, *cert. denied,* 531 U.S. 1052, 121 S.Ct. 656 (2000). The reviewing court must review the record in its entirety to make this determination. *Stobart v. State, Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993). "Consequently, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous." *Ardoin v. Firestone Polymers*, *L.L.C.*, p. 6, 10-245 (La. 1/19/11), 56 So.3d. 215, 219; *see also Harvey v. City of Eunice Police Dep't*, 10-1228 (La.App. 3 Cir. 4/6/11), 62 So.3d 290.

However, statutory interpretations are questions of law. *Shell v. Wal-Mart Stores, Inc.*, 00-997 (La.App. 3 Cir. 3/21/01), 782 So.2d 1155, *writ denied*, 01-1149 (La. 6/15/01), 793 So.2d 1244. Although a reviewing court defers to a trial court's reasonable decision on a question or matter properly within the trial court's discretion, if the trial court's decision is based on an erroneous interpretation or application of the law, such an incorrect decision is not entitled to deference. *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067 (La.1983).

### *Law Enforcement Officers' Right to Effect a Terry Stop*

In its Reasons, the trial court correctly cited both federal and state jurisprudence recognizing the right of law enforcement officers to "temporarily detain and interrogate a person whom he reasonably suspects is committing, has committed, or is about to commit a crime." *Terry v. Ohio*, 88 S.Ct. 1868 (1968); *State v. Belton*, 441 So.2d 1195, 1198 (La.1983), *cert. denied*, 104 S.Ct. 2158 (1984).

In addition, La.Code Crim P. art. 215.1(A) defines the limits of an officer's actions in effecting a *Terry* stop as, "A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is

about to commit an offense and may demand of him his name, address and an explanation of his actions."

The trial court also addressed in its Reasons the definition of "reasonable suspicion," as defined by the supreme court and stated, "Reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference." *Belton*, 441 So.2d at 1198.

In this case, the trial court specifically found, "that the identification by the victim of Floyd as her abuser in a domestic dispute was sufficient and reasonable grounds for the officers to temporarily detain Floyd." The trial court's findings are supported by the testimony of the officers, Ms. Zenon's mother, Tabatha and Ms. Zenon's May 5, 2013 statement taken on the same day as the incident.

The evidence clearly showed that the officers were responding to a domestic dispute call and were questioning Ms. Zenon, the complainant, when a dark SUV passed by with a driver speaking on a cell phone. Ms. Zenon identified the vehicle as one belonging to the perpetrator, James Coleman. Her identification of the vehicle resulted in Corporal Domingue returning to his unit, pursuing, and parking his unit directly behind the identified SUV in a neighboring apartment complex in order to determine the identity of the driver and his possible involvement in the domestic dispute. Thus, we find that the trial court's factual findings were not manifestly erroneous and that the necessary "reasonable suspicion" existed to support Corporal Domingue's actions in instigating a *Terry* stop.

***Duty Imposed on Officers Under "The Protection from Family Violence Act"***

The Louisiana Legislature addressed the issue of domestic violence in a series of statutes entitled "The Protection from Family Violence Act." Louisiana Revised Statutes 46:2131 states in pertinent part:

> The purpose of this Part is to recognize and address the complex legal and social problems created by domestic violence . . . The legislature further finds that previous societal attitudes have been reflected in the policies and practices of law enforcement agencies and prosecutors which have resulted in different treatment of crimes occurring between family or household members and those occurring between strangers. It is the intent of the legislature to provide a civil remedy for domestic violence which will afford the victim immediate and easily accessible protection. Furthermore, it is the intent of the legislature that the official response of law enforcement agencies to cases of domestic violence shall stress the enforcement of laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated.

Louisiana Revised Statutes 46:2140 states with particularity the duty of a police officer when dealing with a domestic abuse situation and states in pertinent part:

> A. Whenever a law enforcement officer has reason to believe that a family or household member or dating partner has been abused, the officer shall immediately use all reasonable means to prevent further abuse, including:
>
> (1) Arresting the abusive party with a warrant or without a warrant pursuant to Code of Criminal Procedure Article 213, if probable cause exists to believe that a felony has been committed by that person, whether or not the offense occurred in the officer's presence.
>
> (2) Arresting the abusive party in case of any misdemeanor crime which endangers the physical safety of the abused person whether or not the offense occurred in the presence of the officer. If there is no cause to believe there is impending danger, arresting the abusive party is at the officer's discretion.
>
> (3) Assisting the abused person in obtaining medical treatment necessitated by the battery; arranging for, or providing, or assisting in the procurement of transportation for the abused person to a place of shelter or safety.

The two officers of the Carencro Police Department were acting in response to a "domestic in progress" call. In other words, this was an ongoing domestic abuse complaint based on a 911 call by Ms. Zenon. Considering the duties imposed on the officers by virtue of "The Protection from Family Violence Act[,]" the legislature has also provided for specific qualified immunity in situations such as the one before this court for review. Louisiana Revised Statutes 46:2142 states:

> Any law enforcement officer reporting in good faith, exercising due care in the making of an arrest or providing assistance pursuant to the provisions of R.S. 46:2140 and 2141[2] shall have immunity from any civil liability that otherwise might be incurred or imposed because of the report, arrest, or assistance provided.

### Does the "Good Faith" Exception of La.R.S. 46:2142 Apply to the Excessive Force Claim of Mr. Floyd?

In its Reasons, the trial court cited La.Code Crim.P. art. 220, which provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."

This court in *Smith v. Guidroz*, 12-1232, p. 11 (La.App. 3 Cir. 10/30/13), 125 So.3d 1268, 1275, quoted *Harvey v. City of Eunice Police Department*, 10-228, pp. 3-4 (La.App. 3 Cir. 4/6/11), 62 So.3d 290, 293, for the standard for an analysis of a claim of excessive force:

> Generally, excessive force claims fall under the duty/risk analysis for negligence claims. *Stroik v. Ponseti*, 96-2897 (La. 9/9/97), 699 So. 2d 1072. Under that standard, the plaintiff must prove, "(1) the conduct in

---

[2] Whenever a law enforcement officer investigates an allegation of domestic abuse, whether or not an arrest is made, the officer shall make a written report of the alleged incident, including a statement of the complainant, and the disposition of the case.

question was the cause-in-fact of the resulting harm; (2) [the] defendant owed a duty of care to plaintiff; (3) the requisite duty was breached by the defendant; [and] (4) the risk of harm was within the scope of protection afforded by the duty breached." *Id*. at 1077. In determining whether there was a breach of duty, the court should apply the factors enumerated in *Kyle v. City of New City of New Orleans,* 353 So. 2d 969 (La. 1977).

In *Kyle,* 353 So.2d 969, the supreme court specifically addressed analysis of excessive force claims, stating:

> The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result.

> Whether the force used is reasonable depends on the totality of the facts and circumstances in each case. A court must evaluate the officers' actions against those of ordinary, prudent and reasonable men placed in the same position as the officers and with the same knowledge as the officers. The degree of force is a factual issue. As such, the trial court's finding is entitled to great weight.

> Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

*Id.* at 972-73. (Citations Omitted.)

Once Corporal Domingue reached the passenger side of Mr. Floyd's vehicle, he found Mr. Floyd talking on a cell phone. The officer testified at trial:

10

> I asked him to please, politely, because he was on the phone, to hang up the phone and speak with me, step out the vehicle to speak with me. Immediately, he advised that he's not hanging up the phone, that he did nothing wrong. At that point in time, I must have told him probably about 15 times to hang up the phone, please step out the vehicle, hang up the phone, please step out the vehicle.

During this exchange with Mr. Floyd, Corporal Domingue called for backup units, including Officer Begnaud, based on Mr. Floyd's refusal to comply with his requests to hang up the phone, exit the vehicle, and speak with Corporal Domingue. During his testimony, Corporal Domingue expressed to the trial court, "I've always been taught that it's not safe to keep a suspect in a vehicle. I can't see all their hands, and it's just not safe for me. I'd much prefer having the subject standing outside the vehicle to where I can speak with him."

Moreover, in *State v. Landry*, 588 So.2d 345 (La.1991), and reaffirmed in *State v. Duhe*, 12-2677 (La. 12/10/13), 130 So.3d 880, the supreme court affirmed an officer's reasonable request after a stop is initiated to order all of the occupants out of the vehicle in order to ensure the officer's safety. "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and maintain the status quo during the course of [a *Terry*] stop.'" *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683-84 (1985). Thus, Corporal Domingue was following both the required procedure and the law when he sought to have Mr. Floyd exit the vehicle. The number of requests and Mr. Floyd's refusal to obey the commands of the officer caused Corporal Domingue to ask for backup in light of the requirements of officers in an ongoing domestic-dispute investigation.

11

Once Mr. Floyd finally exited the vehicle, he continued to argue with the officers. Corporal Domingue testified that once again, Mr. Floyd refused his command to turn around so that he could be placed in handcuffs. Based on Mr. Floyd's previous behavior in resisting the prior commands, Corporal Domingue testified, "I wanted to make sure he didn't hurt me or anybody else." Mr. Floyd was then placed in handcuffs for officer safety.

In *State v. Turner,* 13-0180, p. 3 (La. 3/1/13), 108 So.3d 753, 754-55 (quoting *State v. Porche*, 06-312, p. 8 (La. 11/29/06), 943 So.2d 335, 339), the supreme court stated "the use of handcuffs during a putative *Terry* stop is reasonable if the State can 'point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop **without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm**.'"

Corporal Domingue testified at trial that, based on the training he received at the academy, the repeated refusal of a suspect to respond to a request is considered resisting arrest. The officers were instructed to treat such a suspect with more caution, thus the need for the handcuffs.

The decision to place Mr. Floyd in handcuffs is further supported by Mr. Floyd's attempt to evade detention by walking away from the officers subsequent to the placement of the handcuffs. The video of the incident was recorded by the camera located on Corporal Domingue's police unit. After a review of the video recording, the trial court specifically found:

> It is clear from the police video that Floyd attempted to evade the police after being handcuffed. While the Court understands Floyd's agitation at being detained by the police when he in fact was innocent, he still had an obligation to submit peacefully. The officers

12

did not use excessive or unreasonable force in restraining Floyd, considering the exigency of the situation in which they were placed.

The video as well as the testimony of the eye-witnesses supports the officers' version of events wherein they handcuffed Mr. Floyd and placed him in the police unit. There is no evidence in the record to support Mr. Floyd's version of events wherein he claims he was thrown upon the hood of the police unit and kneed in the back by the officers. His statement to the medical staff at LGMC indicates the officers "threw him on the ground and kicked him in the back and handcuffed him," none of which is supported by the video, the eyewitnesses or the officers' testimony.

Ms. Melinda Gotch, a neighbor of Mr. Floyd, stepped outside and witnessed Mr. Floyd in handcuffs in front of the officer's vehicle. She did not see the officers kick him, slam him against the vehicle, or knee him in the back, but only saw them "pushing him around." She did not see the officers place Mr. Floyd in the police unit.

Ms. Barbara Jean Bernard was identified in Mr. Floyd's deposition testimony as a witness to the incident. She testified at trial that Mr. Floyd was attempting to speak with his father on the cell phone after he exited the vehicle and was being handcuffed by the officers. At that point in time, Ms. Gotch took the phone from Mr. Floyd and also took the minor children out of the Floyd vehicle and brought them to her apartment. Ms. Bernard testified that she saw the officers move Mr. Floyd up against the front of the police unit, and begin to push him toward the door of the police unit and put him in the vehicle. However, she did not witness the officers kick Mr. Floyd or any officer knee him in the back during this maneuver.

13

After he was released, Mr. Floyd testified that he went to the Emergency Room at LGMC. The evidence in the record does not support Mr. Floyd's statements made to LGMC personnel that he was kicked or kneed in the back and thrown to the ground by the officers. The medical reports of the Emergency Room personnel at LGMC, as previously indicated, do not reflect any discernable injury to Mr. Floyd's back and only a slight abrasion on his wrist from the handcuffs.

The record also reflects that the officers released Mr. Floyd from detention within approximately eleven minutes of his initial detention, and shortly after Ms. Zenon confirmed that he was not the aggressor in the domestic dispute. The officers chose not to arrest Mr. Floyd or press charges for resisting an officer.

We agree with the trial court that Mr. Floyd had an obligation to submit peacefully and respond to Corporal Domingue's questions. To have done so would have obviated the need for the entire incident and allowed the officers to pursue Ms. Zenon's ex-boyfriend, Mr. Coleman.

We also agree with the trial court's ruling that the officers were entitled to statutory qualified immunity, based on a finding of good faith. In its Reasons, the trial court specifically found:

> Additionally, La.R.S. 46:2142 provides immunity from civil liability to "any law enforcement officer reporting in good faith, exercising due care in the making of an arrest or providing assistance" involving domestic disputes. This Court finds that this statute provides immunity to these officers while responding to a domestic abuse situation. There is no evidence that the officers failed to exercise good faith or due care in their handling of the situation or in their detention of Floyd.

Finding no manifest error in the trial court's determination of the facts and its application of the law, we hereby affirm the dismissal with prejudice of all of plaintiffs' claims.

***Trial Court's Dismissal of Plaintiffs' Additional Claims***

The trial court dismissed plaintiffs' claims for negligent hiring, training, and/or supervision of the officers based on lack of evidence. It also dismissed the plaintiffs' alleged violation of Mr. Floyd's Miranda Rights on the basis that no evidence was presented that Mr. Floyd "was ever interrogated or placed under arrest." No error was raised by the plaintiffs based on the trial court's dismissal of these two claims and, therefore, they are not before us on appeal.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court dismissing with prejudice all claims of Dominique Floyd individually and on behalf of his minor children K.F. and N.F. against the City of Carencro and Chief Carlos Stout, in his Official Capacity as Chief of Police of the City of Carencro. All costs of this appeal are assessed against Dominique Floyd.

**AFFIRMED.**