Judgment rendered March 18, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 52,974-KW

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Respondent

versus

MICHAEL GLEN ROBINSON                       Applicant

* * * * *

On Application for Writs from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 94178

Honorable Jefferson Rowe Thompson, Judge

* * * * *

LAW OFFICE OF CHRIS L. BOWMAN              Counsel for Applicant
By:  Colby L. Bowman
     Chris L. Bowman
     Sean N. Crain

MICHAEL GLEN ROBINSON                      Pro Se

JOHN SCHUYLER MARVIN                       Counsel for Respondent
District Attorney

HUGO A. HOLLAND, JR.
JOHN M. LAWRENCE
Assistant District Attorneys

* * * * *

Before WILLAMS, PITMAN, and STONE, JJ.

**STONE, J**.

Michael Glenn Robinson ("Robinson") has been charged with possession of methamphetamine, a controlled dangerous substance ("CDS"). Herein, he seeks supervisory review of the trial court's denial of his motion to suppress the subject CDS, which police seized during a traffic stop. For the following reasons, we reverse the trial court's ruling denying Robinson's motion to suppress and remand the matter for further proceedings.

**FACTS**

The prosecution called two witnesses at the suppression hearing: Officer Joshua Lavrinc ("Officer Lavrinc") and Officer Mitchell Hackett ("Officer Hackett"), both of whom work for the Minden Police Department. The narrative of the facts herein is taken from: (1) the video recorded by Officer Lavrinc's dashboard camera, and the audio recording from Officer Lavrinc's body microphone, which is synchronized with and integrated into the video; and (2) the audio recording integrated with the video from Officer Hackett's dashboard camera. These were introduced as state exhibit S-1. The officers' testimony concerning the events depicted by the audio/video are footnoted to the corresponding body text.[1]

On August 24, 2018, Officer Lavrinc pulled Robinson over after observing Robinson's truck swerve multiple times while traveling around 2:00 a.m. down Highway 531 in Minden, Louisiana. Officer Lavrinc's dashcam video begins with Officer Lavrinc driving his own vehicle following Robinson's truck – first at a significant distance, and gradually

---

[1] We note that the prosecution failed to provide the court with any identification of Officer Hackett in the video/audio recordings it introduced as exhibit S-1, and the defense failed to make any objection; this has necessitated our identification of Officer Hackett in the video/audio recordings by matching his testimony with the recordings.

closing the gap. On two occasions, Robinson's truck can be seen to drift toward the boundary of his lane, perhaps so far as his vehicle's tires touching the lines marking the boundaries of the lane within less than a minute. The video does not definitively establish that Robinson crossed the boundary line.[2] Once Officer Lavrinc activated his lights, Robinson stopped and pulled to the side of the road without significant delay. Once both vehicles were stopped, Officer Lavrinc exited his vehicle and walked to the driver's side window of Robinson's truck. He asked for Robinson's driver's license, vehicle registration, and insurance card. While Robinson was gathering these items, Officer Lavrinc also asked Robinson where they were coming from, and Robinson said they were coming from Winnsboro. Officer Lavrinc then asked where they were headed to, and Robinson replied "to visit a friend." Robinson then indicated he was not able to produce his current insurance card, and asked Officer Lavrinc, "What did I do wrong?" Officer Lavrinc explained that he observed Robinson "riding the line" a couple of times and asked whether Robinson had been drinking, which Robinson denied, stating "No, sir."[3] Thus far in the interaction, Robinson's voice did not sound agitated or nervous.

Officer Lavrinc returned to his vehicle to communicate on his police radio. Robinson found a more recent insurance card and held it out the

---

[2] Nonetheless, we cannot say that the trial court's upholding the stop was was error.

[3] Officer Lavrinc testified that, at this point, he tried to engage Robinson in conversation to ascertain if Robinson was intoxicated. Officer Lavrinc testified that Robinson's "mannerisms and his demeanor were a little more intensified than that of somebody on most of the traffic stops of minor traffic violations," and that Robinson started to get a little agitated and his carotid artery was pulsing "extremely hard." He also stated that Robinson was sweating, his hands were shaking, and that the more he (Officer Lavrinc) spoke with Robinson, the more irritated and agitated Robinson became.

driver's side window of his truck and handed it to Officer Lavrinc when he returned. After looking at it, Officer Lavrinc pointed out that it was still expired by roughly 2 weeks, but indicated that he had just learned through a state database that Robinson's vehicle insurance was current.

Office Lavrinc again went back to his vehicle to communicate on his police radio. When other officers arrived as backup, Officer Lavrinc returned to Robinson's truck, and had Robinson step out of his truck and put his hands on it. Officer Lavrinc conducted a *Terry* frisk of Robinson, and Robinson asked what the officer was doing. Robinson's voice did not sound agitated, irritated, or nervous at any point thus far either. Also, during the *Terry* frisk, three officers walked into view of Officer Lavrinc's dash camera; two of them, Officer Hackett and Officer Griffith, walked to the passenger side of Robinson's truck and began speaking with the passenger, Teresa Jones ("Jones"). Later in the video, a fifth officer can be seen assisting with the stop.

After completion of the *Terry* frisk, Officer Lavrinc had Robinson walk to the front of his patrol unit (which is where Robinson stayed until Officer Lavrinc searched his vehicle and shortly afterwards). The video then shows Robinson leaning against the hood of Officer Lavrinc's patrol unit and talking with Officer Lavrinc. Robinson asked "What's the problem?" Again, his tone of voice did not sound particularly nervous or irritated. Officer Lavrinc asked Robinson if he had been drinking or taking any medication, which Robinson denied. For about one second, Officer Lavrinc looked Robinson in the face while shining a medium-sized flashlight in

3

Robinson's face.[4] Officer Lavrinc again explained that he stopped Robinson because he was "deviating from the lanes" and Robinson quickly replied, "So what?" Officer Lavrinc's demeanor and tone of voice immediately went from mild to somewhat aggressive; he said, "So what? Swerving all over the road is not so what." Robinson quickly retreated, saying, "I didn't say so what. I said so what *is this all about*?" After explaining why, he had Robinson get out of his truck, Officer Lavrinc asked whether there were any "guns, knives, bombs, [or] open containers" in the truck, which Robinson denied. Officer Lavrinc retorted, "So then you don't mind if I take a look in the truck?" Robinson denied consent to search the vehicle, stating "You don't need to take a look in the truck." Again, at this point Robinson still did not seem particularly agitated or nervous.

The two officers who had been standing outside the passenger side door of Robinson's truck talking with Jones walked to the front of Officer Lavrinc's vehicle, and one of them, Officer Shane Griffith, began talking with Robinson. At the same time, Officer Lavrinc had walked to the passenger side of Robinson's truck and began talking with Jones. He asked her where they were coming from and where they were going. She stated that they were coming from Winnsboro and were going to see a friend. Lavrinc then asked, "Where is that?" Jones replied, "Down this way. I'm not

---

[4] According to Officer Lavrinc's testimony, around this time, he conducted a standard horizontal gaze nystagmus ("HGN") test on Robinson, seeking to detect signs of intoxication. Essentially, Officer Lavrinc testified that an HGN test is conducted by holding an object in front of the subject's face and moving it back and forth horizontally, and that he conducted the test on Robinson using a pen tipped with a blue light. Officer Lavrinc detected no indication that Robinson was intoxicated. Contrary to this testimony, Officer Lavrinc never did an HGN field sobriety test on Robinson on camera, and Robinson never left the view of the dashboard camera video from Officer Lavrinc's patrol unit at any relevant time.

100% sure on the address or how to get there or anything."[5] Officer Lavrinc then asked her whether Robinson ever had a traffic ticket or whether either of them had ever been arrested. Jones told Officer Lavrinc that she had been arrested before on a "bail charge" and "possession of schedule II," but both charges were dismissed.[6] She also told him that Robinson had been arrested previously, but she did not know the reason. She did not state when these arrests occurred, or whether Robinson was ever prosecuted in relation to the previous arrest. Thereupon, Officer Lavrinc asked Jones, "No schedule II in the vehicle?" She said, "No… Not that…I am aware of…no." At that point, Officer Lavrinc asked her to step out of the vehicle. She indicated that the passenger door would not open, and crawled across and got out on the driver's side. Officer Lavrinc met Jones at the driver's side of the truck and checked her for weapons.

Meanwhile, Officer Hackett, who had initially walked over with Officer Shane Griffith to Robinson's location, went to the passenger side window of Robinson's truck and leaned his head through the window and reached in with his arm. He leaned in far enough that the sole of one of his feet came off the ground as he did so, and the illuminated flashlight in his hand can be seen well inside the truck. [7]

_____

[5]According to Officer Lavrinc's testimony, Jones initially told him that she did not know where they were going or who they were going to see, but later she stated that she recalled where they were going.

[6] Officer Lavrinc testified that Jones told him the arrest had been for methamphetamine possession. The audio recording from his body microphone contradicts that testimony. Specifically, the audio recording reflects that Jones stated she been arrested for possession of "schedule II," but did not mention methamphetamine or any other particular substance.

[7] Officer Hackett testified that he conducted a "plain view look" inside the truck, and he observed a plastic baggie on the floorboard, but could not tell what was in it because all of the clutter on the floorboard around it. He also testified that he did not touch the baggie.

According to Officer Lavrinc's testimony, Officer Hackett, while standing outside the vehicle, conducted a "plain view sweep" of the vehicle and reported to Officer

Robinson, who was watching Officer Hackett while still leaning against the front of Officer Lavrinc's vehicle an approximate 30 feet away, objected. He stated to Officer Lavrinc, "Sir, I didn't ask for him to go in my truck." At this point, Robinson did sound somewhat irritated.

Upon hearing Robinson's objection, Officer Lavrinc and Officer Hackett immediately strode to Robinson and confronted him. The audio recording from Officer Hackett's body microphone reflects the following conversation:

> **Officer Hackett:** Guess what? You know there's such thing as plain view, right? So if I see something that I suspect is drugs or alcohol, I have the right to look at it…
>
> **Officer Lavrinc:** We're also authorized to do a patdown of the vehicle for a weapon. Okay?
>
> **Robinson:** Why are we going in my truck? I didn't give nobody permission.
>
> **Officer Hackett:** It's called plain view. When I can see a clear baggie, I have the right to check it for drugs.
>
> **Robinson:** Clear view of what baggie?
>
> **Officer Hackett:** There is a clear baggie in there that's got either your insurance or your registration.
>
> **Robinson:** That clear baggie with my insurance [in it] gives you the right to search my truck?
>
> **Officer Hackett:** Did I search your truck? No. ***I pulled the baggie out to make sure it wasn't ["coke" or "dope"],[8]*** because that was in plain view… No, I didn't search your truck. (Emphasis added).

Lavrinc that there was a "a small baggie" inside the vehicle. Officer Lavrinc testified that he then looked at the floor of the vehicle for the baggie Officer Hackett was referring to, and he "did observe what appeared to be a small plastic bag that possibly contained residue…on the floor of the vehicle, but it was hard to tell because there was a lot of items on the floor," a lot of "clutter." Officer Lavrinc testified he had no intention of arresting Robinson or Jones at that point.

[8] It is difficult to tell from recording whether Officer Hackett said "coke" or "dope."

At this point, the officers handcuffed Robinson and Jones and advised that they were being detained, not arrested. Also, Officer Lavrinc Mirandized Robinson and Jones. Then the following conversation ensued:

> **Officer Lavrinc:** Before we continue further on, honesty is the easiest thing and the greatest policy for everybody. Before we continue on by investigating further on that bag that's in plain view, is there anything in the truck that you would like us [sic] to let us know about now?

> **Robinson:** No…That don't give you the right to look in my truck if he grabbed it out and looked at it.

> **Officer Lavrinc:** Sir, if it's in plain view…

> **Robinson:** [interrupting:] He already said he grabbed it.

> **Officer Griffith**: [to Robinson:] I don't know where you got your law degree from.

> **Officer Lavrinc:** I have probable cause now.

> **Robinson:** For what? That ain't probable cause…He's already grabbed it and looked at it…

> **Officer Lavrinc:** I have not…

> **Jones:** What was grabbed?

> **Robinson:** He grabbed that ["bag,"][9] that package that has the damn insurance in it. It's got my insurance card in it. That plastic bag is what he's saying.

> **Officer Lavrinc:** That's not what I grabbed. Okay? I'm not sure what this officer did or did not do. I'm talking about my perspective.

> **Robinson:** My perspective is he just told me...

> **Officer Lavrinc:** Right now, this is not your perspective. This is my traffic stop.

_____

[9] It is not entirely certain that Robinson said "bag," but it seems to be most likely that he did.

**Robinson:** It depends on what he saw too.

Without first asking Officer Hackett whether he had already grabbed the bag and looked at it, Officer Lavrinc entered Robinson's truck through the driver's side door and, after searching for a short amount of time, found marijuana in the center console. While Officer Lavrinc was searching the vehicle, the following conversation transpired:

> **Unidentified officer:** Is there something in there? Is that why you're acting like that?
>
> **Robinson:** It's my God damn right, man…
>
> **Unidentified officer:** You know, when people act like that there's usually dope, alcohol, stolen things.
>
> **Second unidentified officer:** Let me explain something to you. You can't tell me where you're going.
>
> **Robinson:** I just told you.
>
> **Second unidentified officer:** Jeremy…You don't even hardly know his last name.

Moments later, Officer Lavrinc returned from searching Robinson's truck and announced that he had found marijuana. He placed Robinson and Jones under arrest, and then the officers further searched the truck and discovered the methamphetamine. However, the plastic baggie containing Robinson's insurance card was not seized or placed in evidence, despite the fact that the officers attempted to justify the protective search in part based on the presence of the baggie in Robinson's truck. Thus, Officer Hackett must have known that it did not contain drugs prior to Officer Lavrinc's protective search.

## DISCUSSION

Robinson assigns the following errors:

8

1. The trial court abused its discretion by denying the motion to suppress when it found that the officers were justified in conducting a *Terry* search of a vehicle when no reason for danger was present and the occupants were removed from the vehicle and handcuffed.

2. The trial court abused its discretion by denying the motion to suppress when the evidence presented showed that the occupants were searched following an unconstitutional *de facto* arrest.

3. The trial court abused its discretion by denying the motion to suppress when the evidence presented showed that officers exceeded the scope of the plain view exception to a warrantless search.

Citing *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), the prosecution argues that the combination of the several factors listed below created reasonable suspicion that there were illegal narcotics in Robinson's vehicle. From that premise, the prosecution concludes, based on the "known association" between illegal narcotics trafficking and guns, that the officers also had reasonable suspicion that there was a weapon in Robinson's vehicle. These factors are:

(1) there was a small plastic baggie in "plain view" on the floorboard of Robinson's vehicle;
(2) Robinson's supposed nervous, agitated demeanor;
(3) Jones' statement that both she and Robinson had previously been arrested (Jones for possession of schedule II CDS); and
(4) Jones' alleged inability to tell the officers where she and Robinson were going.

For several reasons, the prosecution has failed to establish applicability of the exception to the warrant requirement established in *Long, supra.*

## Law

Generally, if evidence was derived from an unlawful search or seizure, the proper remedy is exclusion of the evidence from trial. *State v.*

*Benjamin*, 97-3065 (La. 12/1/98), 722 So. 2d 988; *State v. Lewis*, 52,289 (La. App. 2 Cir. 9/26/18), 256 So. 3d 510, *writ denied*, 18-1811 (La. 3/25/19), 267 So. 3d 598. On a motion to suppress evidence on the ground that it was unconstitutionally obtained, the prosecution has the burden of proving the admissibility of any evidence seized without a warrant. La. C.Cr.P. art. 703(D).

The standard of review applicable to a trial court's decision on a motion to suppress is bifurcated as follows: (1) legal findings or conclusions are subject to *de novo* review; and (2) findings of fact are subject to manifest error review. *State v. Manning,* 50,591 (La. App. 2 Cir. 5/18/16), 196 So. 3d 626, 630. Manifest error review requires great deference to the factfinder's decisions regarding witness credibility. However, if documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error regarding a finding purportedly based on a credibility determination. *Lam ex rel. Lam v. State Farm Mut. Auto Ins. Co.,* 05-1139 (La. 11/29/06), 946 So. 2d 133; *New South Communications v. Wright,* 35,442 (La. App. 2 Cir. 12/28/01), 803 So. 2d 1103.

The right of every person to be secure in his person, house, papers, and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution. However, that declaration of rights "presupposes that there must be an invasion of [the] right to privacy before there can be an unreasonable *search*." *State v. Jackson,* 09-1983 (La. 7/6/10), 42 So. 3d 368. (Emphasis added). Simply stated, if there has been no "search" or "seizure,"

10

as defined by the constitutional jurisprudence, then there cannot be a constitutional violation. With regard to whether a search has occurred, the inquiry is whether there was "an objectively reasonable expectation of privacy in the area." *Id*. The lawful owner or custodian of a vehicle has a recognized right to privacy in the vehicle. *State v. Jewell,* 338 So. 2d 633 (La. 1976). Thus, if police enter a vehicle, it constitutes a "search" within the meaning of the Fourth Amendment to the United States Constitution and Louisiana Constitution Article I, § 5.

A warrantless search or seizure is unreasonable unless it can be justified by one of the narrowly drawn exceptions to the warrant requirement. *State v. Thompson,* 02–0333 (La. 4/9/03), 842 So. 2d 330; *State v. Boyette*, 52,411 (La. App. 2 Cir. 1/16/19), 264 So. 3d 625; *State v. Ledford,* 40,318 (La. App. 2 Cir. 10/28/05), 914 So. 2d 1168.

One such exception to the warrant requirement is the "plain view" doctrine, which holds:

> [I]f police are lawfully in a position from which they view an object that has an incriminating nature which is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.

*State v. Williams*, 2015-0696 (La. App. 1 Cir. 12/23/15), 185 So. 3d 817, 821. It is a corollary that police may use the plain view doctrine to obtain probable cause or reasonable suspicion, which may then establish an element of another exception to the warrant requirement.

If the police have a reasonable suspicion that a person has committed, is committing, or is about to commit a crime, the police may temporarily seize him and ask him his name, address, and what he is doing. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed. 2d 889 (1968). This type of

11

seizure of a person is frequently referred to as a "*Terry* stop." Likewise, if the police have a reasonable fear that the person *Terry* stopped is armed and dangerous, they may pat down the person's outer clothing in search of a weapon. *Id*. This is frequently called a "*Terry* frisk."

A *Terry* stop triggers application of La. C.Cr.P. art. 218.1, which provides: "When any person has been arrested or detained in connection with the investigation or commission of any offense, *he shall be advised fully of the reason for his arrest or detention*."

When examining whether police had reasonable suspicion for a *Terry* stop or *Terry* frisk, courts must "take into account the totality of the circumstances—the whole picture, giving deference to the inferences and deductions of a trained police officer that might well elude an untrained person." *State v. Duhe,* 12-2677 (La. 12/10/13), 130 So. 3d 880, 885-86. (Internal quotation marks omitted). In determining whether the police had probable cause or reasonable suspicion, Louisiana courts have applied the "collective knowledge doctrine," whereby each officer involved in the investigation is fictionally deemed to know the information known by each other officer involved in the investigation. *State v. Elliott*, 09-1727 (La. 3/16/10), 35 So. 3d 247.

Nervousness alone is insufficient to establish reasonable suspicion, but may be a factor militating toward establishing reasonable suspicion. *State v. Belton*, 441 So. 2d 1195, 1198 (La. 1983). In *State v. Burney*, 47, 056 (La. App. 2 Cir. 5/23/12), 92 So. 3d 1184, this court held that the police did have a reasonable suspicion that a vehicle which had initially been stopped for a traffic violation contained drugs, based on four factors: (1) the defendant and his passenger gave conflicting explanations as to the purpose

of their travels; (2) the defendant and his passenger were "obviously nervous"; (3) a strong odor of air freshener emanated from the passenger compartment of the defendant's vehicle (which the officer testified, in his experience, was commonly used to mask the odor of drugs); and (4) the defendant had prior drug-related arrests. In *Burney*, the officer summoned the canine unit and detained the defendant and his passenger until the canine unit arrived. The issue was whether the extension of the traffic stop was justified.

In analyzing whether police had a reasonable fear that a suspect was armed, Louisiana courts have recognized the "well-known association of guns and narcotics trafficking generally," and a heightened connection of methamphetamine production (in particular), with violence and guns. *State v. Duhe, supra*.[10]

---

[10] *Duhe* used that rationale as *a part* of the justification for the protective sweep of a vehicle's compassion department for weapons. The details of *Duhe* are discussed *infra*. *State v. James*, 1999-3304 (La. 12/8/00), 795 So. 2d 1146, relied on the same rationale as justification for a frisk of a suspect's person where the owner of a convenience store called the police and complained that the suspect was in the convenience store parking lot selling narcotics. *Thompson, infra,* which involved the execution of narcotics search warrants on multiple rooms at a hotel, held that a frisk of a suspect was justified because: (1) the encounter occurred in a location that was notorious for narcotics dealing; (2) the suspect was leaning in the doorway of one of the targeted rooms; and (3) the configuration of the hotel and the multiple targets of the search warrants increased the possibility of danger to the executing officers. In *State v. Broussard*, 2000-3230 (La. 5/24/02), 816 So. 2d 1284, the court upheld a frisk of the suspect's person where: (1) the officers observed a third person who had just sold a cocaine rock to an undercover officer get into the suspect's vehicle for only a brief moment, whereupon the suspect departed; (2) upon the police stopping him with a box-in maneuver, the suspect threw his vehicle into reverse and tried to back away in a highly populated neighborhood; and (3) the neighborhood was known for narcotics trafficking. In *State v. Wilson,* 2000-0178 (La. 12/8/00), 775 So. 2d 1051, the court upheld a frisk of a suspect where: (1) the encounter occurred in a "high narcotics trafficking area"; (2) at a late hour, the officer observed the suspect crouching near the driver's door of a vehicle parked at the curb and engaged in some type of interaction with the driver; and (3) the suspect, upon seeing the officer's marked police car, abruptly started walking away and jammed both his hands in his jacket pockets; and (4) the driver of the vehicle with whom the suspect had been interacting immediately turned away from the curb and attempted to re-enter traffic; (5) the officer testified that, previously, he had purchased drugs in the immediate area in an undercover capacity several hundred times, and had made several hundred drug arrests in the immediate area. In *State v. Ardison*, 52, 739 (La. App. 2 Cir. 6/26/19), 277 So. 3d 883, a panel of this court upheld a frisk of the suspect's person where: (1) the encounter

However, the "well-known association of drugs and firearms does not invariably justify…[a protective search for weapons]…Each case must turn on its particular circumstances." *State v. Thompson*, 11-0915 (La. 5/8/12), 93 So. 3d 553.

If a police officer observes a traffic infraction, then the subsequent stop for that offense is clearly legal. *Whren v. United States,* 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *State v. Hunter*, 46,194 (La. App. 2 Cir. 4/13/11), 62 So. 3d 340, *writ denied*, 11-0889 (La. 11/4/11), 75 So. 3d 921, *cert. denied*, 568 U.S. 875, 133 S. Ct. 254, 184 L. Ed. 2d 136 (2012); *State v. Barnard,* 37,032 (La. App. 2 Cir. 5/14/03), 847 So. 2d 99. Whenever any roadway has been divided into two or more clearly marked lanes for traffic, a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety. La. R.S. 32:79.

For the safety of the officer making a traffic stop, the vehicle's occupants may be ordered to exit the vehicle pending completion of the stop. *Maryland v. Wilson,* 519 U.S. 408, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997); *State v. Hunt*, 09-1589 (La. 12/1/09), 25 So. 3d 746. However, "[t]o justify a patdown of the driver or passenger during a traffic stop…The police must harbor reasonable suspicion that the person subjected to the frisk is armed

---

occurred at a known "trap house," *i.e.*, a house at which drug dealers gather to ply their trade, and at which numerous narcotics and weapons arrests had previously been made; and (2) the suspect, upon seeing the officers, abruptly started walking towards the street, apparently seeking an escape route. *State v. Sewell,* 40, 768 (La. App. 2 Cir. 10/20/05), 912 So. 2d 719 is another case wherein this court upheld a frisk of the suspect's person based on: (1) the location of the encounter in an area known for drug trafficking; and (2) upon seeing the officer, the suspect quickly climbed into the vehicle and the vehicle sped off; and (3) the officer activated his lights to stop the vehicle, and someone attempted to jump out of the vehicle before it stopped traveling.

14

and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).[11] (Emphasis added).

In *Michigan v. Long, Supra*, the United States Supreme Court upheld the warrantless search of a vehicle's passenger compartment for weapons. In so holding, the Supreme Court extended *Terry, supra.*

Two police officers, patrolling in a rural area at night, observed a car traveling erratically and at excessive speed. *Long, supra*. When the car swerved into a ditch, the officers stopped to investigate and were met by Long, the only occupant of the car, at the rear of the car. Long, who "appeared to be under the influence of something," did not respond to the initial requests for his license and registration. When Long began walking toward the open door of the car, apparently to obtain the registration, the officers followed him and saw a hunting knife on the floorboard of the driver's side of the car. The officers then stopped and frisked Long, but found no weapons. *Id.* One of the officers shined his flashlight into the car, saw something protruding from under the armrest on the front seat, and upon lifting the armrest saw an open pouch that contained what appeared to be marijuana. Long was then arrested for possession of marijuana.

The Supreme Court upheld the search and seizure on the rationale that the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his vehicle to retrieve his license and registration.

---

[11] In *Texas v. Brown,* 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983)*,* the United States Supreme Court stated that the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection. *Hunt, supra*; *State v. Edsall,* 385 So. 2d 207 (La. 1980).

In *Duhe*, *supra,* the Louisiana Supreme Court cited *Long, supra*, in upholding the seizure of 40 pseudoephedrine tablets from inside a vehicle parked at a Wal-Mart. The investigating officer, a narcotics detective, was at the Wal-Mart because of frequent complaints regarding the purchase of pseudoephedrine for the purpose of making methamphetamine. *Duhe, supra*.

In the Wal-Mart pharmacy, the detective observed Jimmy Catchings purchase a box of cold and allergy medicine from behind the counter. The detective suspected the medication contained pseudoephedrine--which could only be purchased from behind the pharmacy counter. The detective also noticed that Duhe, who had been standing in the same line at the pharmacy, purchased something moments later, though the detective did not see what he bought. *Id*.

The detective observed Duhe exit the store and join Jimmy Catchings in the back seat of a vehicle parked in the parking lot. Both men were looking down in their laps, which made the detective suspicious that the two were "smurfing" (a tactic used by methamphetamine producers by which several people purchase pseudoephedrine at staggered intervals in the same pharmacy – to avoid alerting authorities).[12]

The detective then moved his patrol unit to a parking space directly behind the vehicle in which Duhe and Catchings were sitting. He observed a third person, passenger Deanne Wetzler, get out of the vehicle and walk into

_____

[12] The detective further explained that, in order to combat production of methamphetamine, purchases of medication containing pseudoephedrine are recorded in a database used by pharmacies and law enforcement. The database is intended to help prevent "smurfs" from purchasing pseudoephedrine from multiple locations. *Id*.

the Wal-Mart. The detective then observed a fourth person, Sky Hatcher, approach the vehicle and get into the driver's seat, and made a hand-to-hand exchange with Duhe in the car.

At that point, the detective suspected that the two had conducted a drug transaction. He and his partner approached the vehicle and asked Hatcher to step out of the vehicle. When Wetzler returned from the store with a bag in her hand, the detective's partner stopped her, seized the bag, and directed her to the police vehicle. The detective opened the bag and found allergy medication containing pseudoephedrine. *Id.*

The detective removed Duhe and Catchings from the car, patted down both men and placed Duhe in handcuffs. The detective testified that because the car doors were "open and unlocked," he conducted a "wing span" search of the car to locate any weapons therein. The detective observed two empty boxes of 20-count Sudafed (which contained pseudoephedrine) and four empty blister packs lying on the top of the rear seat. The detective also found a tied off Wal-Mart bag on the rear seat. The detective opened the bag and observed 40 loose tablets of Sudafed, although the tablets were ordinarily packaged individually in blister packs. *Id.*

The Louisiana Supreme Court stated that the detective had reasonable suspicion to detain the vehicle's occupants, and that he acted reasonably in entering the vehicle in a search for weapons to protect himself and his partner. *Duhe* further held that that the detective had the authority to handcuff Duhe.

In support of its holding, the *Duhe* court pointed to the detective's testimony that he observed Duhe engage in what he believed to be the

17

procurement of ingredients for making methamphetamine, and that the

officers were outnumbered by the vehicle's occupants two to one, stating:

> Given the number of suspects [four] and the well-known
> association of guns and narcotics trafficking generally, the
> detective's decision to handcuff Duhe for the duration of
> the stop was justified for officer safety and did not convert
> the encounter from a *Terry* stop to an arrest." *Id*. at 886.

*Duhe* also reasoned that the protective sweep was justified given that

the doors to the vehicle were wide open and the four occupants were

standing nearby, and only one of them was handcuffed.

In *State v. Heard*, 46,230 (La. App. 2 Cir. 5/18/11), 70 So. 3d 811,

*writ denied*, 11-1291 (La. 12/2/11), 76 So. 3d 1175, two police officers were

patrolling in a high crime area and heard very loud music coming from

Heard's vehicle. The officers stopped Heard, and as they pulled behind his

vehicle, they noticed him making sudden movements between the driver's

side door and the center console, as though moving something from one area

to another.  As Heard exited the vehicle, one officer observed a large amount

of cash in the side pocket of the driver's side door. That officer did a *Terry*

frisk on Heard without handcuffing him. Meanwhile, the second officer

reached through the passenger side window and opened the vehicle's center

console, wherein he found a handgun.  The officers confirmed that Heard

had a prior felony conviction and arrested him. *Id.*

This court upheld the search of the vehicle's center console, citing

*Long, supra*. In *Heard,* the officers had a reasonable fear that the vehicle

contained a weapon that the defendant could access based on the following

factors: (1) the stop occurred in a high crime area where patrols had recently

been increased as a result of gun violence; (2) Heard apparently tried to hide

something within the vehicle upon the stop, and he acted nervously upon exiting the vehicle; (4) officers noticed a large amount of cash in the side door pocket; (5) Heard was not handcuffed at the time of the search. Furthermore, the officer conducting the search went directly to the center console, *i.e.,* where *Heard* had apparently tried to hide something upon being stopped. Thus, the search was limited in scope to the center console which rightly was the focal point of the officers' suspicion. On that basis, this Court found that the protective search for weapons was reasonable. *Heard, supra*.

## Analysis

We begin our analysis by evaluating the testimony of Officers Hackett and Lavrinc in light of the video and audio recordings (collectively, the "recordings") described in the "FACTS" section of this opinion. As detailed below, both officers gave testimony – on multiple material matters – which irreconcilably contradicted the recordings. Based on these contradictions, and one point of inherent illogicality in Officer Lavrinc's testimony, we reject these officers' testimony completely. Thus, our evaluation of the prosecution's theory of the case is necessarily intertwined with our discussion of the officers' credibility.

**Officer Lavrinc's credibility**

Officer Lavrinc's testimony that he performed an HGN field sobriety test on Robinson irreconcilably contradicts the video/audio recording from his dash camera and body microphone. His testimony regarding the actions he took after Officer Hackett informed him about the plastic baggie also appears to contradict the dash camera video. Additionally, his testimony

regarding his suspicion that there were drugs and weapons in the vehicle is internally inconsistent and implausible on its face.

*HGN field sobriety test*. Officer Lavrinc testified that, shortly after having Robinson exit his truck, he conducted a standard HGN field sobriety test[13] on Robinson using a pen tipped with a blue light. See n.4, *supra*. He admitted that the alleged test yielded no sign of intoxication. However, the dashboard camera video disproves his claim that an HGN field sobriety test was conducted at any relevant time. In particular, it shows: (1) that no HGN field sobriety test was conducted in front of the camera; and (2) Robinson stayed on-camera the entire time between when Robinson exited his vehicle and the time Officer Lavrinc searched Robinson's truck.[14] Finally, there is no indication from the audio/video (or the testimony) that the recording equipment was deactivated as to account for the alleged field sobriety test not being recorded. Based on these facts, it seems totally impossible that Officer Lavrinc's testimony that he conducted an HGN field sobriety test on Robinson is true. Nor did any other officer conduct a field sobriety test on Robinson before the search of the truck.

*Officer Lavrinc's testimony regarding his look at the clear plastic baggie before conducting protective search.* After Officer Hackett leaned through the passenger window of Robinson's truck and grabbed the plastic baggie on the floorboard, he walked to where Officer Lavrinc, Robinson,

---

[13] A horizontal gaze nystagmus test is "[a] field sobriety test for intoxication, in which the suspect is told to focus on an object (such as a pencil) and to track its movement, usually from side to side, by moving only the eyes. Intoxication is indicated if the eyes jerk or twitch while tracking the object." *Black's Law Dictionary*, (8th ed. 2004)

[14] Likewise, the audio recording from Officer Lavrinc's body microphone is high-quality and is synchronized in real time with the video footage; Officer Lavrinc's speech can easily be understood at all times, except when other people are talking over him. The audio and video recordings do not reflect Officer Lavrinc conducting a field sobriety test on Robinson

20

and Jones were standing and announced that there was a clear plastic baggie on the floorboard. Regarding his actions immediately upon receiving this information, Officer Lavrinc testified that he: (1) went back to the truck to take a look at what Officer Hackett had seen; (2) returned to the front of his vehicle to converse more with Robinson and Jones (who were standing there); and (3) *then* went and did the protective search of Robinson's vehicle, as follows:

> At that point in time, wanted to get my own personal eyes on – to be able to locate whatever it was Officer Hackett had seen; so I walked back to the vehicle. *I took a look*. I did observe what appeared to be a small plastic bag that possibly contained residue. It was on the floor of the vehicle, but it was hard to tell because there was a lot of items on the floor. (Emphasis added).

He further testified:

Q: Okay. So what was your plan at that point? You're just going to write a violation and cut them loose?

A: At that point in time, I was just going to try to have a little bit further of a conversation and speak to the two individuals that were in front of my patrol car.

Q: Tell me about that conversation.

A: When I came back and I had talked with Ms. Jones, I had asked, you know, about her background and her history little bit, and she'd informed me that she'd been – she'd been previously charged with the possession of schedule II methamphetamine.

On the video, Officer Lavrinc did not walk back to the truck and merely "t[ake] a look" in the truck to put his "own personal eyes…[on] whatever it was Officer Hackett had seen." Instead, he started towards the passenger window of Robinson's truck three times, but each time, he stopped short and walked back to where Robinson was and argued with him. He never went and looked through the passenger window. Instead, after

returning to argue with Robinson for the third time, he went directly to the driver side door of the truck and began the protective search.

***Suspicion of DWI, weapons and drugs in the truck.*** In summary, Officer Lavrinc testified that he suspected Robinson was intoxicated, and that he believed he had reasonable suspicion that there were drugs and weapons in Robinson's truck. Nonetheless, Officer Lavrinc testified that he *was planning to release Robinson and Jones to go free in Robinson's truck –* but only after he searched the truck for a weapon to ensure the officers' safety upon releasing Robinson and Jones. This is inconsistent, illogical and implausible. If Officer Lavrinc believed he had reasonable suspicion that Robinson was driving while intoxicated and carrying illegal drugs, why would he plan to release Robinson (to drive away in his truck) without conducting a dog sniff or a field sobriety test?

***Jones' statement***. Officer Lavrinc testified that Jones stated to him that she had previously been arrested for possession of methamphetamine. The video reveals that she did not say that. Instead, she said she had been arrested for "possession of schedule II." This is of particular relevance given that the jurisprudence recognizes a *heightened* connection between methamphetamine activities – as opposed to narcotics trafficking generally – and guns and violence. *Duhe*, *supra*.

Based on the foregoing, we find that Officer Lavrinc's testimony must be rejected as lacking credibility, and the trial court committed manifest error in relying on it. Officer Lavrinc's testimony is rejected in its entirety.

**The clear plastic baggie; Officer Hackett's credibility**

The prosecution has failed to prove that the plastic baggie was in plain view. The dashcam video shows, prior to the protective search of the

22

vehicle, Officer Hackett leaned through the passenger side window of Robinson's truck and reached well inside the truck with his hand, in which he was holding a flashlight. In fact, Officer Hackett leaned so far into the truck that the sole of his foot came off of the ground as he did so. The illuminated flashlight in his hand can be seen well inside the truck. In the audio recording integrated with his police vehicle's dashboard camera video, Officer Hackett admitted that he reached in the truck and grabbed the clear plastic bag containing Robinson's insurance or vehicle registration to check and see if it contained illegal drugs.

This in itself constituted a warrantless search of Robinson's truck, not a "plain view look" as Officer Hackett testified. Officer Hackett even went as far as attesting specifically that he was not searching the vehicle at this point.[15] Finally, in glaring contradiction to his statement recorded live at the scene of the incident, he also testified *that he did not touch the plastic baggie.*

If this direct contradiction between Officer Hackett's testimony and his statements in the recordings were not enough, there is yet further proof of the prosecution's failure to establish that the bag was in plain view. In particular, it was only after this search of Robinson's truck that Officer Hackett reported seeing the plastic baggie. Officer Hackett would have had no reason to lean through the window and reach into the truck to shine his

---

[15] Officer Hackett testified that he has been a police officer for five years, has participated in quite a few traffic stops, and has noted that 70% to 80% of the time when there are drugs in the vehicle, there is also a firearm in the vehicle. He also agreed that he has noticed that there is a "normal level of nervousness" in people who are stopped by the police, and that small plastic baggies such as the one allegedly on Robinson's floorboard are used to carry illegal drugs. Such an experienced officer must know that leaning and reaching through the window of a vehicle does constitute a search, not a "plain view look."

flashlight if he could see something that established reasonable suspicion or probable cause without doing so. He also did not testify that he could see the plastic baggie from outside the truck, *i.e.*, a lawful vantage point.

Accordingly, the prosecution failed to prove satisfaction of the plain view doctrine regarding the plastic baggie, and the officers' alleged knowledge of the baggie must be considered derived from an unlawful warrantless search. Accordingly, the plastic baggie must be disregarded in determining whether the officers had reasonable suspicion to search the truck under *Long, supra*.

Moreover, even if the clear plastic baggie could properly be considered, it would serve to *negate* reasonable suspicion, not support it. Under the collective knowledge doctrine, Officer Hackett's knowledge that the plastic baggie did not contain illegal drugs is imputed to Officer Lavrinc. *Elliott, supra*.

Therefore, the trial court manifestly erred in considering the clear baggie at all. Furthermore, in considering the plastic baggie, the trial court erroneously treated it as *supporting* reasonable suspicion, when Officer Hackett's statements on the recording show that he had already checked it and found no illegal drugs prior to the protective search. *Elliott, supra*.

Based on this testimony in direct contradiction to the video/audio recordings from the incident, we conclude that Officer Hackett's testimony is incredible in its entirety. The trial court committed manifest error to the extent it relied on Officer Hackett's testimony in denying the motion to suppress.

**Robinson's agitation, irritation, and "not wanting to comply with anything"**

The dashboard camera video reveals Robinson did not seem agitated until he watched Officer Hackett lean through the window of Robinson's vehicle. Likewise, the video shows that most or all of what the officers characterized as "agitated," "irritated," and "not wanting to comply with anything" consisted of Robinson asking why he was initially stopped, why he was being *Terry* frisked, asking why the stop was being continued, objecting to officer Hackett leaning through the window of his truck, arguing that there was no justification for a search of the vehicle, and making clear that he did not consent to a search of the vehicle. Robinson was totally compliant with the officers' commands, and did not seem agitated on the video until he saw Officer Hackett illegally search his truck under the guise of plain view.

In light of these facts, and the officers' the lack of credibility, these characterizations provide no support for a finding of reasonable suspicion. Indeed, La. C.Cr.P. art. 218.1, *supra*, commands police officers, upon detaining a citizen in connection with the investigation or commission of any offense, to fully advise the detained citizen of the reason for the detention. It is a corollary that a citizen has the right to ask for full a full explanation of why he is being detained. As a matter of law, the officers' characterizations of Robinson's requests for this explanation cannot serve as a basis for reasonable suspicion. The same is true of Robinson's refusal to consent to a search of his truck, and his objection to Officer Hackett's unconstitutional search of the truck.

**Justification for the search**

Officer Lavrinc had reasonable suspicion under *Terry, supra*, to believe that Robinson had violated a traffic law, and therefore the initial stop

25

was valid. Officer Lavrinc was also justified in having Robinson and Jones step out of the vehicle.

The issue is whether the officers had reasonable suspicion to justify a protective search of the vehicle's passenger compartment. Justification for a protective search of the vehicle exists if:

> The officer possesses a reasonable belief based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the officer to believe that the suspect is dangerous *and* the suspect may gain immediate control of weapons. (Emphasis added).

*Long, supra.*

Whether the prosecution proved satisfaction of the standard set forth in *Long, supra,* must be evaluated in light of the fact that, at the time of the protective search, Robinson and Jones were handcuffed behind their backs and standing in front of Officer Lavrinc's patrol car, and that the police outnumbered Robinson and Jones five to two. In making this determination, it is also important that the officers purportedly intended to release Robinson and Jones (despite their suspicions that Robinson was intoxicated, and had weapons and illegal drugs in the truck). However, before releasing them, Officer Lavrinc purportedly wanted to conduct the protective search to ascertain whether there was a weapon in the vehicle – and take certain safety precautions if so. Accordingly, the dispositive question here is whether Officer Lavrinc was reasonable in suspecting that Robinson and/or Jones, upon being released to go free and reentering Robinson's vehicle, would have had immediate access to a weapon *and* would have been dangerous to the officers, who presumably would then have been leaving the scene to go on about their business.

We find that the only credible evidence is the video/audio recording, which reveals: (1) Jones and Robinson both perhaps seemed intentionally vague when they said they were going "to see a friend;" (2) Jones was previously arrested for possession of "schedule II" CDS; and (3) when asked whether there was any "schedule II" in the truck, Jones said "No… Not that…I am aware of… No." We hold that these facts are inadequate to establish reasonable suspicion of drug possession or other criminal activity.

Furthermore, even if the facts underlying prosecution's theory of the case were deemed proven, the police still lacked reasonable suspicion to believe that there were firearms or other dangerous weapons in the vehicle. As explained above in n.8, *supra*, the prosecution relies entirely on the "known association between guns and narcotics trafficking," *i.e.*, the inference that, because the police reasonably suspected illegal drugs in the vehicle, they were therefore also reasonable in suspecting that firearms were present in the vehicle.

The prosecution's theory is not supported by the jurisprudence. All of the cases upholding frisks/protective searches of vehicles for weapons based on the known association between guns and narcotics trafficking involved a much more particularized basis for suspecting that the defendant was engaged in narcotics *trafficking*, or that the defendant was dangerous, or both. See n.10, *supra*. In this case, the officers had an inadequate basis for a particularized suspicion that Robinson and Jones were engaged in narcotics trafficking (as opposed to illegal drug possession for mere personal use, for example) or were dangerous. The officers' encounter with Robinson and Jones did not occur in an area known for drug trafficking, and they did not have any basis for suspecting that Robinson and/or Jones had just engaged in

27

a narcotics transaction. Robinson and Jones did not try to flee from or avoid the officers; rather, they submitted to being detained. The officers had no informant tip that Robinson and Jones were trafficking narcotics. Jones' previous arrest for possession of schedule II CDS, which was dismissed, and which occurred at an unknown point in the past, does not suffice to transform the officers' generalized suspicion to a particularized suspicion of narcotics trafficking.

Third, the prosecution's theory, even if its factual grounds were deemed proven, does not establish a basis for reasonable suspicion that Robinson and/or Jones would have been a danger to the officers. An affirmative finding on that point would require proof of a reasonable suspicion that, *upon being released to go free as they wished without legal consequences*, Robinson and/or Jones would use the suspected weapon to attack one or more of the five armed police officers present at the scene. Such would be extremely irrational – likely suicide on the part of Robinson and/or Jones, as well as murder or attempted murder of one or more police officers. The prosecution failed to show any reason to believe Robinson or Jones objectively had such a motive or rational incentive, nor can we imagine any after reviewing the evidence. Furthermore, the evidence does not show any indication that Robinson and/or Jones was violent, homicidal or suicidal due to something such as anger, rage, intoxication, insanity, or other mental infirmity. Accordingly, we hold that, even if the alleged facts underlying the prosecution's theory of the case were deemed proven, they still did not establish a reasonable suspicion that Robinson and/or Jones would have become dangerous upon being released.

## CONCLUSION

For the foregoing reasons, we REVERSE the trial court's ruling denying Robinson's motion to suppress and remand the matter for further proceedings.